No. 61,002

MARGARET L. FOLKS, INDIVIDUALLY AND AS ADMINISTRATRIX OF THE ESTATE OF KENNETH L. FOLKS, DECEASED; MICHAEL KENNETH FOLKS, A MINOR; AUBREY LYNN FOLKS, A MINOR; AND DIANA ELAINE FOLKS, A MINOR; BY AND THROUGH MARGARET L. FOLKS, THEIR NATURAL MOTHER, NEXT FRIEND, AND CONSERVATOR, *Appellees/Cross-Appellants*, v. THE KANSAS POWER AND LIGHT COMPANY, *Appellant/Cross-Appellee*.

(755 P.2d 1319)

Opinion filed April 29, 1988.

*Frederick K. Starrett,* of Miller and Bash, P.C., of Overland Park, argued the cause and was on the briefs for appellant/cross-appellee.

*Donald W. Vasos,* of Vasos, Kugler & Dickerson, of Kansas City, argued the cause, and *Stephen G. Dickerson,* of the same firm, was with him on the briefs for appellees/cross-appellants.

*Dwight A. Corrin,* of Corrin & Krysl, Chartered, of Wichita, and *Ricky E. Bailey,* of Focht, Hughey, Hund & Calvert, of Wichita, were on the brief *amicus curiae* for Kansas Trial Lawyers Association.

*Michael L. Koon,* of Shook, Hardy & Bacon, of Overland Park, and *Matthew D. Keenan,* of the same firm, were on the brief *amicus curiae* for Kansas Association of Defense Counsel.

The opinion of the court was delivered by

LOCKETT, J.: Defendant, The Kansas Power and Light Company (KPL), appeals the judgment in a wrongful death and survival action brought by the surviving spouse and minor children of Kenneth Folks, deceased. Folks, a painter employed by the third-party defendant, Martin Painting Company, was fatally injured when a metal ladder he was using came in contact with defendant's power line. The jury awarded plaintiffs actual and punitive damages and compared fault. KPL appeals raising numerous issues, including the amount of the punitive damages

awarded by the jury. Plaintiffs cross-appeal from the trial court's reduction of the jury award by the percentage of fault attributed to the employer. *Amicus curiae* briefs have been filed by the Kansas Association of Defense Counsel (KADC) and the Kansas Trial Lawyers Association (KTLA). We affirm the judgment for actual damages and the trial court's reduction of the actual damages by the percentage of fault attributed to the employer, but reduce the amount of the punitive damages to $500,000 because, under the facts of this case, the amount awarded by the jury shocks the conscience of this court. Plaintiffs may accept the remittitur of the amount of punitive damages in writing within 10 days after this decision becomes final by filing their acceptance of the remittitur with the clerk of the district court, or receive a new trial on the issue of punitive damages.

## FACTS

In May 1984, Kenneth Folks, an employee of Martin Painting Company, was part of a crew painting a new building at the Business World construction site in Lawrence, Kansas. The building was vacant and not connected to the electrical power system. Earlier, in March 1984, KPL had installed two 40-foot poles near the building, one on the southeast corner of the site and a second pole 199 feet directly north. KPL then extended an existing circuit to the second pole by installing two wires in a vertical stack, with the energized wire low and the neutral or ground wire high. The energized wire was a single phase 7,200 volt uninsulated line and was located 24 feet, 9 inches vertically and 6 feet, 6 inches horizontally as it passed the building. The highest point of the building was approximately 35 feet, and the unpainted wall of the building was approximately 10 feet higher than the energized electrical line.

Before beginning to paint the building, Joseph Martin, owner of the painting company, discussed the danger of the overhead power line with Folks and the rest of his crew. About noon, Folks, standing on the ground between a 32-foot ladder and the wall, held the ladder away from the building, while Martin, who was standing on the ladder, attempted to extend it. As Folks moved the ladder away from the wall, it contacted the overhead power line. Folks fell to the ground, still breathing. He was taken to the hospital and was pronounced dead at 2:23 p.m.

Folks' widow and minor children filed a wrongful death and survival action against KPL, alleging that KPL had negligently designed, installed, and maintained the power line that caused Folks' death. KPL's answer denied negligence and alleged that Folks and his employer had been negligent. KPL joined Martin Painting Company as an additional party for the purpose of comparative negligence. The case was tried to a jury which found KPL 85%, Martin Painting Company 15%, and the decedent, Folks, 0% negligent and awarded $1,000,000 in actual damages (survival action - $10,000; wrongful death action - $490,000 [pecuniary] and $500,000 [non-pecuniary]). The jury also found that KPL's act had been willful or wanton and awarded $1,000,000 in punitive damages. After reducing the plaintiffs' actual damages by the percentage of fault attributed to Martin Painting Company and making adjustments for the wrongful death limitations, the district court entered a judgment for a total sum of $1,450,000. Both parties appeal.

When reviewing the questions raised on appeal, we are hampered because there is no written pretrial order as required by Supreme Court Rule 140(e) (1987 Kan. Ct. R. Annot. 77). We are forced by the lack of a pretrial order to glean the facts from the record or rely on the judge's statements, which are based on his handwritten notes made at the pretrial conference.

## COMPLIANCE WITH INDUSTRY (NATIONAL ELECTRICAL SAFETY CODE) STANDARDS

Plaintiffs alleged that KPL negligently failed to exercise the highest degree of care in the design, construction, and maintenance of its overhead power lines. They further alleged that even though KPL knew or should have known workers engaged in construction and painting would be forced to work near the 7,200-volt power line, KPL created an unreasonable risk of serious injury. KPL argued that there was no evidence that it breached a duty to Folks; therefore, it was entitled to a directed verdict.

When ruling on a motion for directed verdict, both the trial court and the appellate court are required to resolve all facts and inferences reasonably to be drawn from the evidence in favor of the party against whom the ruling is sought and, where reason-

able minds could differ based on the evidence, the motion must be denied and the case submitted to the jury. *Holley v. Allen Drilling Co.*, 241 Kan. 707, 710, 740 P.2d 1077 (1987).

Distributors of electricity are neither liable for occurrences which cannot be reasonably anticipated nor insurers against accidents and injuries. *Murphy v. Central Kansas Electric Co-operative Ass'n,* 178 Kan. 210, 214, 284 P.2d 591 (1955). However, because of the dangerous nature of their product, they are required to exercise the highest degree of care to avoid injury to others. *Wilson v. Kansas Power & Light Co.,* 232 Kan. 506, 510-12, 657 P.2d 546 (1983) (citing *Henderson v. Kansas Power & Light Co.,* 184 Kan. 691, 339 P.2d 702 [1959]). The degree of care required of distributors of electricity is the degree which would be used by prudent persons engaged in the industry, under like conditions and commensurate with the dangers involved and the practical operation of the plant, to guard against contingencies which can be reasonably foreseen and anticipated. Where the wires maintained by a company are designed to carry a powerful current of electricity, so that persons coming in contact with them are certain to be seriously injured or killed, the law imposes upon the company the duty of exercising the utmost or highest degree of care to prevent such injury, especially where high-tension wires are suspended over the streets of populous cities or towns. 26 Am. Jur. 2d, Electricity, Gas, and Steam § 44, pp. 248-50.

KPL claims, even though its high-voltage line was suspended above a construction site, it was not negligent because the power line exceeded the clearance requirements developed by the Institute of Electrical and Electronic Engineers and published in The National Electric Safety Code (NESC), Table 234-1, which requires a five-foot horizontal clearance between power lines and adjacent buildings. KPL reasons that, since the NESC guidelines set the standard applicable to the design, maintenance, and operation of power lines, compliance with the guidelines precludes a finding of negligence as a matter of law. KPL's argument fails for several reasons.

First, it is the general rule that conformity with the NESC or an industry-wide standard is not an absolute defense to negligence. While it may be evidence of due care, compliance with industry

standards, or standards legislatively or administratively imposed, does not preclude a finding of negligence where a reasonable person would have taken additional precautions under the circumstances. *Jones v. Hittle Service, Inc.*, 219 Kan. 627, 632, 549 P.2d 1383 (1976) (citing *Garst v. General Motors Corporation*, 207 Kan. 2, 484 P.2d 47 [1971]). Whether the company is negligent, even though it complied with the code, is usually a question to be determined by the jury under proper instructions by the court. *Henderson v. Kansas Power & Light Co.*, 184 Kan. at 701.

Second, there was evidence that the NESC guidelines were not even applicable to Business World because the site was still being constructed. The National Electric Safety Code is supplemented by the "National Electric Safety Code Interpretations" which apply to situations not addressed by the code. Interpretation IR 59, 1974, states:

"INTERPRETATION (Oct 7, 74)

"Clearances involving building construction sites are not covered by this Code. This was the subject of a previous interpretation dated March 12, 1963 (rule 234C4, IR 98). It was pointed out that there are too many variables which may affect clearance requirements for buildings under construction. It was felt that any set of clearances which covered the worst situation would inherently penalize other situations where different construction equipment and methods were used. Clearances from completed buildings are covered in Rule 234C. Rule 232A does not apply to building sites under construction. The U.S. Labor Department (OSHA), especially 29CFR1926, as well as most states, have regulations regarding the clearances between cranes and energized power lines."

Third, the NESC guidelines set only a minimum safety standard. The Introduction to the NESC states:

"The purpose of these rules is the practical safeguarding of persons during the installation, operation, or maintenance of electric supply and communication lines and their associated equipment. They contain *minimum* provisions considered necessary for the safety of employees and the public." (Emphasis added).

Finally, plaintiffs also introduced evidence that KPL:

1. violated the provisions of Lawrence, Kansas, Ordinance No. 5284 pertaining to Underground Wiring Districts;

2. failed to warn that its two-wire overhead line had been constructed with the energized line below the neutral line; that the wire was energized;, that when energized, the line carried 7,200 volts; and that contact with the line would result in serious injury or death;

3. failed to design, construct and maintain its lines in conformity with local good practice;

4. failed to cover, guard, raise, bury, relocate, isolate, insulate, or de-energize the bare 7,200volt primary overhead line that Folks contacted;

5. failed to comply with the minimum requirements of its own work safety rules; and

6. failed to develop or implement an appropriate policy of accident prevention to assist field personnel in preventing or reducing the occurrence of long metal objects contacting bare overhead power lines, including the line contact resulting in the death of Kenneth Folks.

Accepting as true all facts which the evidence tends to prove without reweighing the evidence, and drawing all reasonable inferences against KPL, there is substantial competent evidence to have submitted the case to the jury. The trial court did not err in denying KPL's motion for directed verdict.

FAILURE TO WARN

KPL argues that the trial court improperly allowed the jury to consider whether KPL negligently failed to warn those working at the construction site that its two-wire overhead line had been constructed with the energized high-voltage line below the neutral line and that contact with the line could result in serious injury or death.

The failure of a power company to post warning signs at particular places of danger may be a factor in determining negligence. 26 Am. Jur. 2d, Electricity, Gas, and Steam § 156, p. 369. As a matter of law, it is not unreasonable to require a power company to place warning signs when extending high-voltage lines over private property. Further, the alleged unreasonableness of an electric company in failing to post warning signs presents a question of fact and is a proper question to be submitted to the jury. *Henderson v. Kansas Power & Light Co*, 184 Kan. at 696-98 (citing *Worley v. Kansas Electric Power Co.*, 138 Kan. 69, 23 P.2d 494 [1933]).

KPL and *amicus curiae* KADC argue that because (1) the danger of high-voltage electricity is well known in general and

(2) Folks and his employer discussed the overhead line on the morning of the accident, Folks' actual knowledge of the danger obviated any duty to warn on the part of KPL. They compare the situation of Folks to the plaintiff in *Wilson v. Kansas Power & Light Co.*, 232 Kan. 506, where the plaintiff and his brother were laying irrigation pipe near a power line located at the edge of farm property. There, KPL's power line was plainly visible and both brothers knew the inherent danger of the electrical power line. The *Wilson* court stated that normally the existence of a duty to warn is a question for the trier of fact to determine, but that "in this case, however, there [was] no evidence whatsoever that the presence of any warning signs would have prevented the accident," 232 Kan. at 514. The Court then held that, as a matter of law, KPL had no duty to warn.

*Henderson* and *Wilson* demonstrate that there is a distinction in the duty to warn between those who maintain electric power lines in rural as opposed to urban areas. However, even though there is a different duty to warn in urban areas than there is in rural areas, the degree of care required to protect the public from danger in either situation is the highest degree which would be used by a prudent company engaged in the industry under like conditions.

Here, there was evidence that the energized high-voltage line that killed Folks had not been connected to service customers and that the accident would not have occurred if KPL had not energized the line. In addition, both plaintiffs' and KPL's witnesses testified that an average person could not tell which of the two wires was energized. The evidence showed that, without any signs to warn of the danger, KPL placed its power lines in a vertical stack with the energized high-voltage wire below the neutral wire in an urban area where it knew that construction was occurring.

A question of fact was presented as to whether Folks should have known the wire was energized and, even if he knew, whether he reasonably could have assumed that the lower wire was the neutral one. The issue of KPL's breach of a duty to warn was properly submitted and the jury was correctly instructed, under principles of comparative negligence, to consider whether Folks' prior knowledge of the danger was a factor which contributed to his death.

## ADMISSION OF PRIOR ACCIDENTS

KPL argues that the trial court erred in admitting evidence of 14 prior power line accidents. To determine this issue, it is necessary to review the procedure followed by the trial court in admitting the prior accidents, as well as the circumstances which evolved during discovery of the accident reports. During discovery, plaintiffs were able to determine that KPL maintained handwritten log books of accidents. The four log books obtained contained over 15,000 accidents. Plaintiff requested production of 309 accident reports dealing with ladders, construction accidents, or long metal objects contacting overhead wires. After it was revealed that 111 of the reports had been destroyed by KPL, plaintiffs reviewed the remainder and requested that 33 be furnished. The trial court reviewed the reports and found that the 33 reports were relevant.

At trial, KPL objected to the admission of all evidence of prior accidents. Ultimately, after reviewing all the accidents outside the hearing of the jury, the trial judge admitted 14 accident reports. These included two accidents in Lawrence involving painters whose ladders contacted a 7,200 volt power line and two similar accidents outside Lawrence. All of these accidents resulted in serious injury or death. In addition, evidence of four accidents resulting in death from overhead contact with metal pipes and antennas was admitted. Finally, six accident reports destroyed by KPL, involving antenna contact, were read into the record from the original log book. KPL does not dispute that the evidence of prior accidents was admitted to prove foreseeability.

It is the duty of electric companies to guard against contingencies which can be reasonably foreseen and anticipated, and it is not necessary that the precise injury should have been anticipated so long as the probability of injury to someone who had a right to be in the vicinity might have been reasonably anticipated. *Henderson v. Kansas Power & Light Co.*, 184 Kan. at 696; 26 Am. Jur. 2d, Electricity, Gas, and Steam § 43, p. 252. Evidence of prior similar accidents is admissible to prove foreseeability as long as the prior accidents involve substantially similar circumstances. *Powers v. Kansas Power & Light Co.*, 234 Kan.

89, 97-98, 671 P.2d 491 (1983). For further discussion, see *Kearney v. Kansas Public Service Co.*, 233 Kan. 492, 497-98, 665 P.2d 757 (1983).

In a civil case, the admission of evidence of prior acts or occurrences is committed to the sound discretion of the trial court and will be overturned on appeal only upon a showing of abuse. The admission of such evidence will always carry a potential for prejudice. Where the prior accident evidence was admitted to prove foreseeability, exact similarity of prior accidents with the accident in question is not necessary as long as the prior accident was one which would have warned the defendant.

KPL and *amicus curiae* KADC argue that the rationale of *Horn v. Chicago, R.I. and Pac. Rld. Co.*, 187 Kan. 423, 357 P.2d 815 (1960), which involved an accident at a railroad crossing, bars the admission into evidence of the 14 prior KPL power line accidents involving metal objects. We disagree. In *Horn*, the prior accident was offered to prove that the crossing was dangerous. Here, prior similar accidents were not offered to prove that the wire was dangerous, but to show notice or foreseeability of the danger. All of the accidents were similar, since each involved a long metal object contacting a KPL high-voltage line. KPL's own literature classified the accidents into the same specific category. Since the accidents involved substantially similar circumstances, no abuse of discretion has been shown.

KPL, even though it failed to object during trial, also claims that the court improperly admitted evidence that KPL failed to give immediate notice by telegram to the Kansas Corporation Commission (KCC) of all accidents resulting in loss of life or serious personal injury, as required by K.S.A. 66-132. The chief engineer of the KCC testified that the KCC had received 27 reports from 1971 to 1984, but that there were six years during which no reports were made. When six of these accident reports were then admitted, defense counsel did not object. KPL has not demonstrated that this evidence was so prejudicial that, even though it failed to object to the admission of the evidence, it should receive a new trial.

## SUBMISSION OF VIOLATION OF LAWRENCE UNDER-
GROUND WIRING ORDINANCE TO JURY

KPL claims, since the underground wiring ordinance did not apply to the Business World site, it was improper for the jury to determine whether it violated the ordinance. We disagree. Lawrence, Kansas, Ordinance No. 5284 provides in part:

"Underground Wiring Districts

"5-450.  DEFINITIONS. Definitions of terms as used in sections 5-443 to 5-448 inclusive, shall be as follows:

"(a) Underground Wiring District - shall mean an area in the City of Lawrence, Kansas, within which poles, overhead wires and associated overhead structures are prohibited by this article.

. . . .

"5-451.  "REQUIRED IN NEW AREAS. The governing body of the City of Lawrence, does hereby find and determine that the public interest requires that all poles, overhead wires and associated overhead structures used in supplying electric, communication or related service to be constructed within an underground wiring district in the city be placed underground in order to promote and preserve the health, safety and general welfare of the public and to improve the appearance and the orderly development of the city. From and after June 22, 1976, it shall be unlawful, except as specifically provided herein, for any person or utility to erect, construct, use or maintain any pole, overhead wires and associated overhead structures within an underground wiring district. (Ord. 5284)

"5-452.  UNDERGROUND WIRING DISTRICTS ESTABLISHED. (a) The governing body of the city further finds and determines that the public interest requires that all areas within the city, platted and unplatted, which are not developed and which do not have any electrical or communication services installed on June 22, 1976, are hereby declared to be underground wiring districts.

. . . .

"5-454.  SPECIAL EXCEPTION. Notwithstanding any other provisions of this article, the city governing body may grant special exceptions on a permanent or temporary basis to the provisions hereof on such terms as the governing body may deem appropriate in cases of emergency or unusual circumstances to any party to erect, construct, install, maintain, use or operate poles and overhead wires and associated overhead structures within any underground wiring district. (Ord. 5284)"

"5-4A08.  PENALTY. Any person or utility who shall erect, construct, place, or operate any such pole, overhead wire, or associated overhead structure within an underground wiring district in violation of this article, or who shall otherwise fail to comply with the

provisions of this article shall be guilty of a misdemeanor and, upon conviction thereof, shall be punishable by a fine not to exceed five hundred dollars ($500) for each offense. (Ord. 4683, Sec. 8)"

Though KPL's witness, the chief building inspector for the City, testified that it is the responsibility of the developer or architect to get a variance from the ordinance, there was sufficient evidence for the jury to disregard his testimony. The Business World site was an undeveloped area which had no electric service prior to the beginning of construction. The ordinance clearly makes the utility directly responsible for violations. It also provides that an approval of a site plan does not allow a utility company to violate the terms of the ordinance and allows only the city governing body to grant an exception to the ordinance. Further evidence was introduced which showed that a site plan, dated September 30, 1979, specified underground service and that when the developer applied for electrical service on February 10, 1984, the clerk checked the box marked "UG" or underground. In short, the evidence on the issue of violation of the ordinance raised a question of fact and it was not error to submit the question of a violation of the ordinance to the jury.

KPL argues, even if the evidence on the violation of the underground wiring ordinance is admissible, the jury should have been instructed to compare the fault of the City of Lawrence and the developer/architect. Prior to trial, KPL did not request that the City or the developer/architect be joined as party-defendants for the purposes of comparing their negligence as provided by K.S.A. 60-258a. The judge's notes, made at the pretrial hearing, indicate that KPL requested that the jury compare only the negligence of Folks, his employer, and KPL. After all the evidence had been submitted to the jury and the parties were arguing about which instructions should be given, KPL, for the first time, asked to join the City and the developer/architect to compare their negligence. Under such circumstances, the judge properly found that it would be unfair at that stage of the trial to allow the defendant to add the City or the developer/architect as defendants.

## AWARD FOR PAIN AND SUFFERING

In the survival action, the jury awarded Folks $10,000 for pain and suffering. KPL contends, because there was "no competent" evidence that Folks was conscious after the accident and prior to his death, the award for pain and suffering is improper.

Under Kansas law, the testimony of lay witnesses is admissible on the issue of consciousness. In *Pape v. Kansas Power & Light Co.*, 231 Kan. 441, 448, 647 P.2d 320 (1982), the court affirmed the jury's award of damages for pain and suffering because Pape was observed to have been breathing and audibly moaning immediately after the accident and later squeezed his wife's hand in response to her questions. In this case, there is conflicting testimony regarding whether Folks was conscious after the accident had occurred. A police officer testified that when he arrived on the scene Folks was breathing and making incoherent noises, and appeared to be conscious. Folks' employer testified that Folks was never conscious. The jury considered the conflicting testimony, determined that Folks was conscious, and properly awarded damages for pain and suffering.

## OTHER TRIAL ERRORS

KPL complains of several other trial errors which it argues demand reversal because they denied KPL a fair trial. First, KPL contends that Instruction 13 unduly and improperly emphasized plaintiffs' case because the judge refused to insert the word "safe" before the word "design." The instruction read in part: "The National Electric Safety Code contains minimum requirements and guidelines for the design, construction and maintenance of power lines." KPL ignores that the NESC itself states that its guidelines "contain minimum provisions considered necessary for the safety of employees and the public. They are not intended as a design specification or an instruction manual." The instruction was a correct statement and conformed to the evidence.

Second, KPL complains that the court erred in the admission of surprise evidence. Specifically, KPL contends that the court should have disallowed the testimony of Dr. Gary Baker, plaintiffs' economist. The court, however, found that KPL had over two weeks' notice before trial that this witness would be called; therefore, KPL could not complain it was surprised. A

careful review of the record reveals that KPL received sufficient notice that the witness would testify and the trial judge did not abuse his discretion by allowing the testimony.

KPL next complains of "prejudicial comments" made by the judge during trial. These statements include: (1) two comments made when the court *sustained* one of KPL's objections; (2) one comment directed at *both* attorneys concerning surprise evidence; and (3) allowing leading questions to be asked of some of KPL's witnesses.

"[N]o comment or remark should be made by a judge, during the trial of an action, which may tend to excite prejudice or hostility in the minds of the jurors toward one of the party-litigants, or sympathy for the other, *but a mere possibility of prejudice from a remark of the judge is not sufficient to overturn a verdict or judgment, and, where a construction can properly and reasonably be given to a remark which will render it unobjectionable, it will not be regarded as prejudicial.*" *Plains Transport of Kansas, Inc. v. Baldwin,* 217 Kan. 2, 10, 535 P.2d 865 (1975.) (Emphasis added.)

Here, the jury was instructed that it was not to consider or draw inferences from rulings of the court upon evidentiary objections, and that verdicts were to be based entirely upon the evidence adduced at trial and the law as set forth in the instructions.

Further, Instruction No. 5 stated:

"Neither in these instructions nor in any ruling, action, or remark that I have made during the course of this trial have I intended to interpose any opinion or suggestion as to how I would resolve any of the issues of this case."

After examining the statements and having read the transcript, we find no instances of prejudice or reversible error.

## PUNITIVE DAMAGES

After the reduction of the jury's award of actual damages by the percentage of fault attributed to Folks' employer and adjustments for the wrongful death limitation, under the law, the plaintiffs were compensated as far as a monetary award can compensate the widow and fatherless children. The punitive damages, on the other hand, were not an award of money to compensate for the loss of Kenneth Folks, but to punish and

restrain KPL and deter other providers and distributors of electricity from committing similar wrongs in the future.

In the 127-year evolution of the common law of punitive damages in Kansas, only recently have the amounts awarded caused much concern. All states except Louisiana, Massachusetts, Nebraska, and Washington allow punitive damages under the common law or by statute. Most states, ·including Kansas, allow punitive damages to be awarded for compensation, punishment, deterrence of the defendant, or deterrence of others. See Ghiardi & Kircher, 1 Punitive Damages L. and Prac. § 4.16, Table 4-1 (Cum. Supp. 1987).

Punitive damages were first discussed by Chief Justice Crozier in *Malone v. Murphy*, 2 Kan. 250 (1864). The *Malone* court stated:

"There has been much discussion in the Courts, and among elementary writers upon the subject of vindictive damages, or 'smart money' as they are sometimes styled. Several decisions sustain the rule laid down by the court below; and Mr. Sedgwick, in his admirable work upon the measure of damages, takes the same view. Mr. Greenleaf thinks the damages should be limited to compensation only. Logically we think he is right, and were the question an open one, we should be inclined to adopt his view of the subject. But it can make no difference practically which rule is adopted in the trial of a cause. If the jury shall be confined to compensation for the injury sustained, they will be authorized to estimate injury to the feelings, mental anguish and tarnished honor; and in assessing damages for these things their own judgment can be their only guide. No standard can be fixed—no rule of compensation established. All must necessarily be left to the discretion of the jury, subject only to the power of the court to determine whether their estimate, if apparently excessive, has been influenced by passion or prejudice." 2 Kan. at 261-62.

The right of the jury to determine the amount of punitive damages was reaffirmed in *Albert Wiley v. Keokuk*, 6 Kan. 94 (1870). In addition, the *Wiley* court expanded the awarding of punitive damages solely for compensation by recognizing that, under the common law as well as statutory law, whenever the elements of fraud, malice, gross negligence, or oppression mingle in the controversy, men are often punished for aggravated misconduct or lawless conduct by way of a civil action and by the damages inflicted by way of penalty or punishment given to the party injured. The court held such an award of damages was not only good law, but was founded on sound principles and beneficial in its application, and noted that such damages often

furnish the only restraint upon a bad man, who cares little for his neighbor's character, his person, or his property. The court refused to adopt the Massachusetts, Indiana, and North Carolina limitation that, where the civil action is based on a crime, the wrongdoer should not be punished both by the criminal law and the civil law. The *Wiley* court concluded, "If the law [of awarding punitive damages] is wrong, let the law-making power correct it." 6 Kan. at 106.

Today, the increase in the frequency and size of punitive damage awards has resulted in requests to legislatures or courts to change the standards for awarding punitive damages. Proposals include imposing legislative caps, holding bifurcated trials, or requiring a higher standard of proof, *i.e.*, clear and convincing. Another option suggested is to remove wanton acts from the acts for which punitive damages can be awarded and limit punitive awards to willful conduct.

## ERROR TO SUBMIT ISSUE OF KPL'S WILLFUL AND WANTON CONDUCT TO THE JURY

In Kansas, punitive damages are awarded to punish the wrongdoer for his malicious, vindictive, or willful and wanton invasion of another's rights, with the ultimate purpose being to restrain and deter others from the commission of similar wrongs. *Wooderson v. Ortho Pharmaceutical Corp.*, 235 Kan. 387, Syl. ¶ 17, 681 P.2d 1038, *cert. denied* 469 U.S. 965 (1984). A jury may consider an award of punitive damages if any reasonable view of the evidence would support such an award. *Johnson v. Colt Industries Operating Corp.*, 797 F.2d 1530 (10th Cir. 1986). "To constitute wantonness, the acts complained of must show not simply lack of due care, but that the actor *must be deemed* to have realized the imminence of injury to others from his acts and to have refrained from taking steps to prevent the injury because indifferent to whether it occurred or not." *Cope v. Kansas Power & Light Co.*, 192 Kan. 755, 761, 391 P.2d 107 (1964) (quoting *Frazier v. Cities Service Oil Co.*, 159 Kan. 655, 157 P.2d 822 [1945]). (Emphasis supplied.)

KPL states that it was error to submit the issue of punitive damages based on willful and wanton conduct to the jury because its compliance with the NESC was conclusive evidence

of good faith. KPL further contends that, in addition to the "shield" of compliance with the NESC, there was no evidence that KPL had either a realization of the imminence of any danger at the site or a reckless disregard or indifference to possible consequences. KPL presented one argument to the jury in its defense—namely, that KPL had exceeded the minimum requirements of the NESC by one and one-half feet and, therefore, it was not negligent. The jury obviously rejected this position.

We note that KPL's argument on appeal assumes compliance with the NESC. However, substantial evidence was presented at trial to show that the NESC guidelines did not even apply to construction areas specifically because of the many variables found at such sites. Further, under tort law, compliance with industry standards does not shield KPL from a finding of negligence and is not conclusive on the issue of due care. Nor does compliance with industry standards automatically preclude a finding of wanton or willful conduct. KPL's acts and whether they were negligent, willful, or wanton were judged by looking at the particular facts and circumstances of the case.

In sum, the issue is, viewed in the light most favorable to the plaintiffs, was there evidence from which a jury could have concluded that KPL was clearly indifferent to the rights of others? See *Wooderson v. Ortho Pharmaceutical Corp.*, 235 Kan. at 416. Specifically, the jury considered whether KPL's placement of a 7,200-volt power line with a 6 and ½ foot horizontal and a 24 and ¾ foot vertical clearance from a 35-foot tall building under construction showed or should be deemed to have shown realization of and indifference to danger, where defendant conceded that it was foreseeable that the building would have to be painted, that tall ladders would have to be used, and that, when ladders were propped against the building, the 6-foot clearance from the power line would be diminished. Further, KPL placed an energized line a few feet away from a building under construction at a time when the line was not needed, in violation of a Lawrence ordinance and in violation of the interpretations of the NESC. Similar accidents with KPL's power lines which resulted in death or serious injury had occurred in the recent past. KPL was clearly aware of the danger inherent in the placement of the line, but left it up to the Martin painters to protect themselves.

There was additional evidence from which it could be inferred that KPL was aware that it had created an unnecessary danger for its own convenience and with complete disregard for the safety of others. Under these facts, there was sufficient evidence presented to submit the issue of punitive damages to the jury.

## ERROR IN JURY INSTRUCTIONS

KPL complains that instructions defining wanton and willful conduct and the factors a jury should consider in awarding punitive damages were improper under the facts of this case. The first instruction is taken directly from PIK Civ. 2d 3.02 and 3.03 and is a correct definition of acts which are willful and wanton.

Wanton conduct is defined in PIK Civ. 2d 3.02 as follows:

"An act performed with a realization of the imminence of danger and a reckless disregard or complete indifference to the probable consequences of the act is a wanton act."

Willful conduct is defined in PIK Civ. 2d 3.03 as follows:

"An act performed with a designed purpose or intent on the part of a person to do wrong or to cause an injury to another is a wilful act."

PIK Civ. 2d 3.02 and 3.03 are required to be given if a plaintiff is entitled to punitive damages based on such conduct. The instructions state that either willful or wanton conduct is sufficient under Kansas law for the imposition of punitive damages. For conduct to be wanton, no element of intentional wrongdoing is required.

Recently, this court has dealt with several punitive damage cases where manufacturers of products exhibited willful conduct amounting to fraud and deception of the public for private gain. See *State ex rel. Stephan v. GAF Corp.*, 242 Kan. 152, 747 P.2d 1326 (1987); *Tetuan v. A.H. Robins Co.*, 241 Kan. 441, 738 P.2d 1210 (1987); *Wooderson v. Ortho Pharmaceutical Corp.*, 235 Kan. 387. We upheld substantial awards for punitive damages in these cases. Other Kansas cases have upheld punitive damage awards for conduct more wanton than willful. See *Ford v. Guarantee Abstract Title Co.*, 220 Kan. 244, 553 P.2d 254 (1976). There, we held that the reckless indifference by defendant title company amounted to wanton conduct and supported the award

of punitive damages. The instruction here was a correct statement of the law regarding willful and wanton acts.

The other instruction of which KPL alleges is error followed PIK Civ. 2d 9.44 (1986 Supp.) and provided the jury with the factors it could consider when awarding punitive damages. That instruction stated:

"If you find that plaintiffs are entitled to recover, and you also find that the conduct of the defendant was wilful or wanton, then in addition to the actual damages to which you find plaintiffs entitled, you may award plaintiffs an additional amount as punitive damages in such sum as you believe will serve to punish defendant and to deter others from like conduct.

"If you do award punitive damages in this case, then in assessing the amount of such damages you may consider the following:
1. The amount of actual damages assessed on the survival claim;
2. The nature, extent and enormity of the wrong;
3. The financial condition of the party committing it;
4. The probable expenses of litigation;
5. Any mitigating circumstances tending to minimize the amount of such damages.
"You may not award punitive damages unless you award actual damages."

KPL argues it was error to allow the jury to consider litigation expenses and the financial condition of KPL when no evidence of those factors was introduced. Initially, we note that in *Brewer v. Home-Stake Production Co.*, 200 Kan. 96, 100, 434 P.2d 828 (1967), this court held that an instruction allowing the jury to consider litigation expenses was proper with or without evidence.

While preparing the instructions for the jury, the judge stated that he did not believe that the jury would award the plaintiffs punitive damages; therefore, he would not allow the plaintiffs to present evidence of KPL's worth. The judge reasoned that evidence of the enormous net worth of KPL would influence the jury's award of actual damages.

Our prior decisions do not require that a plaintiff present evidence on the net worth of a defendant to justify the size of the award for punitive damages. In assessing punitive damages, the nature, extent, and enormity of the wrong, the intent of the party committing it, and all circumstances attending the transaction are allowed to be considered by the jury. *Will v. Hughes*, 172 Kan. 45, 55, 238 P.2d 478 (1951). In addition, the jury may

consider the amount of actual damages recovered, defendant's financial condition, and the probable litigation expenses. *Ayers v. Christiansen,* 222 Kan. 225, 229, 564 P.2d 458 (1977).

We agree with KPL that, if the trial judge does not believe that the financial condition of KPL should be considered in awarding punitive damages and no evidence of the defendant's financial condition is introduced for the jury to consider, the jury should not be instructed to consider defendant's financial condition in awarding punitive damages. However, after reviewing the record, we do not feel the instruction is clearly erroneous, nor that, if that portion of the instruction had not been given, there is a real possibility that the jury would have returned a different verdict. *State v. Houck,* 240 Kan. 130, 139, 727 P.2d 460 (1986).

JURY MISCONDUCT

KPL also attacks the punitive damage award on the basis of juror misconduct. KPL has attached an affidavit of juror Marilyn Downs in which she states that she advised the other jurors that the usual legal fee would be 33⅓% and that the other jurors adjusted the damage award accordingly. Plaintiffs have attached affidavits from five other jurors who all state that the purpose of the damage award was to punish KPL for wanton conduct and that no specific amount of attorney fees was discussed by the jury. This conflicting evidence is insufficient to establish a basis for juror misconduct relating to the punitive damage award and KPL has not shown that its rights were substantially prejudiced.

ERROR IN NOT ORDERING A REMITTITUR FOR PUNITIVE DAMAGES

A plaintiff has no right to punitive damages except when awarded by the jury under the common law. Whether to award punitive damages and in what amount is for the jury to determine. When awarded, punitive damages are reviewed by the trial judge if requested by post-trial motion. The party assessed punitive damages at trial has the option to request a new trial, that the award be set aside, or that the trial judge grant a remittitur. The award of punitive damages will not be set aside unless the trial judge finds that the award (1) was based on passion, prejudice, or bias; (2) was based on mistake of law or fact; or (3) lacked evidentiary support.

Where a verdict is so excessive and out of proportion to the damages sustained as to shock the conscience of the court and judgment has been entered, the trial judge may tentatively affirm the judgment, provided that the plaintiff will accept a reduced judgment, or may grant a new trial. *Barnes v. St. Francis Hospital & School of Nursing*, 211 Kan. 315, 321, 507 P.2d 288 (1973). A party that accepts a remittitur is precluded from appealing the reduction of the award.

The party assessed punitive damages has the right to appeal the trial court's denial of the motion for a new trial and the denial of the party's request for a remittitur of the punitive damages. On appeal, the decision of the trial court will not be reversed unless the appellate court determines that the trial court abused its discretion by affirming an award of punitive damages (1) based on prejudice, passion, or bias; (2) based on a mistake of law or fact; or (3) which lacked evidentiary support. However, if the appellate court determines the trial court did not abuse its discretion in affirming the award of punitive damages, but the award is so excessive and out of proportion as to shock the conscience of the appellate court, the appellate court may tentatively affirm the judgment and allow the plaintiff to either accept a reduced amount or be granted a new trial on the issue of punitive damages.

KPL argues that its conduct did not warrant $1,000,000 in punitive damages and that the award is disproportionate to the actual damage award of $10,000 in the survival action. (Both parties agreed that only the survival action provided a basis for the recovery of punitive damages.) It is difficult to formulate precise rules of law to determine whether an award of punitive damages is excessive. The law establishes no fixed ratio between actual and exemplary damages by which to determine excessiveness. Since there is no fixed ratio to determine what is reasonable, it is difficult to state a rule with precision.

Here, KPL's defense was that it had complied with the NESC and should be absolved of responsibility. This argument did not convince the jury that KPL had used the highest degree of care under the circumstances. It is also clear from the juror affidavits that, when awarding punitive damages, the jurors considered KPL's lack of public safety procedures in comparison to the extensive safety measures taken for KPL employees.

An award of punitive damages must be reviewed in the light of the actual damages sustained, the actual damage award, the circumstances of the case (the nature, extent, and enormity of the wrong), the intent of the party committing it, the relative positions of the plaintiff and the defendant, the defendant's financial worth and the plaintiff's probable litigation expenses. See *Wooderson v. Ortho Pharmaceutical Corp.*, 235 Kan. at 420. When reviewing punitive damages, any mitigating circumstances which may bear upon any of the above factors may be considered to reduce such damages. *Will v. Hughes*, 172 Kan. at 55. See *Ayers v. Christiansen*, 222 Kan. 225.

As noted earlier, an award of punitive damages serves the twin purposes of punishment and deterrence. Punitive damages are not awarded because of any special merit in the injured party's case. Therefore, a punitive damage award which is more than necessary to punish or deter, or which inflicts a penalty or burden on a wrongdoer disproportionate to the wrongful act, is excessive and contrary to the policy and purpose of awarding punitive damages. The circumstances of each case determine whether the award of punitive damages is excessive and contrary to public policy.

In *Wooderson v. Ortho Pharmaceutical Corp.*, 235 Kan. 386, the defendant ignored scientific and medical evidence that use of its product caused serious damage. Ortho continued to use the product, played down its harm, and gave physicians no warning of the dangers involved. The jury awarded the plaintiff $2,000,000 for actual damages and $2,750,000 in punitive damages. The *Wooderson* court reviewed the award of punitive damages and determined that, under the facts, the amount of punitive damages awarded by the jury did not shock its conscience.

This court also approved an award of $1,700,000 in compensatory damages and $7,500,000 in punitive damages against the A.H. Robins Co., the manufacturer of the intrauterine contraceptive device known as the "Dalkon Shield." *Tetuan v. A.H. Robins Co.*, 241 Kan. 441. In *Tetuan*, there was overwhelming evidence that Robins knew the Dalkon Shield was not only ineffective, but unsafe. Despite this knowledge, the company

continued to manufacture, promote, and sell the device. Even after being sued by the injured users of the device, Robins consistently denied and concealed the product's dangers by fabricating test results and destroying hundreds of documents which would have revealed that Robins was well aware of the dangers.

In *Will v. Hughes*, 172 Kan. 45, the lessor's agent denied the lessee the right to enter the leased ground. The agent then cut and sold the lessee's wheat and gave the money to lessor. The *Will* court, after assessing the extent and enormity of the wrong and insuring that the policy behind the punitive damage award was not defeated, reduced the punitive damage award of $500 to $250.

In *Ford v. Guarantee Abstract & Title Co.*, 220 Kan. 244, the purchaser of real estate paid the purchase price at closing to a realtor-escrow holder, who transferred the fund to a title insurance company and its agent with instructions that the purchasers were to receive title before the funds could be disbursed. Contrary to the instructions, the title company disbursed the funds prior to the receipt of title. Because the purchasers were unable to receive a clear title, they requested that the title company return the escrow funds. The title company refused and the purchaser filed an action against the title company and its agents for the purchase price and for punitive damages for wrongfully withholding the purchaser's money. The *Ford* court found the jury award of punitive damages excessive and reduced it.

In *Will* and *Ford*, the punitive damage award was more than necessary to punish or deter, and inflicted a penalty or burden disproportionate to the wrongful act. By contrasting the wrongfulness of the acts of the defendants in *Will* and *Ford* with those in *Ortho Pharmaceutical Corp.* and *A.H. Robins*, we may ascertain why the large punitive damage awards against the latter were approved by the appellate court.

Both Ortho and A. H. Robins knowingly embarked upon a course of conduct dangerous to the public, motivated by private gain. The acts of KPL in this case do not rise to the level of wrongfulness of the acts of the drug manufacturers in the above cases. Here, the $1,000,000 punitive damage award against KPL

is more than necessary to punish or deter and amounts to a penalty or burden on KPL disproportionate to the wrongful act. Considering all the facts and circumstances that led to the death of Folks, it is our collective belief, as the appellate court, that the award of $1,000,000 punitive damages is excessive and contrary to public policy and shocks our judicial conscience. Accordingly, the judgment of $1,000,000 punitive damages against KPL is reduced to $500,000 upon the condition that the plaintiffs accept the reduced amount of punitive damages in writing within ten days after this decision becomes final by filing their acceptance with the clerk of the district court. If the plaintiffs fail to accept the remittitur within the time allotted, they are granted a new trial on the issue of punitive damages against the defendant.

CROSS-APPEAL

Plaintiffs cross-appeal the trial court's reduction of the jury award of actual damages by the 15% of fault attributed to the decedent's employer. Plaintiffs claim, since the jury found that KPL's conduct was wanton, KPL is jointly and severally liable for all actual and punitive damages awarded. This position is contrary to our present law. The trial court was correct in reducing the amount of actual damages by the percentage of fault attributable to Folks' employer. K.S.A. 1987 Supp. 60-258a.

The judgment of the district court is affirmed as modified.

HOLMES, J., concurring and dissenting: I concur in the results reached by the majority on the issue of actual damages. I respectfully dissent from any award of punitive damages in this case. In my opinion there was no submissible case of willful or wanton conduct on the part of The Kansas Power and Light Company which would justify an award of punitive damages. I would reverse the award of punitive damages in toto.

McFARLAND, J., joins in the foregoing concurring and dissenting opinion.