PUBLISH

# UNITED STATES COURT OF APPEALS

**Filed 9/4/96**

## TENTH CIRCUIT

———————————

| | | |
|---|---|---|
| CHASE MORSEY, JR., | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | No. 95-3165 |
| | ) | |
| CHEVRON, USA, INC., | ) | |
| | ) | |
| Defendant-Appellee. | ) | |

———————————

**Appeal from the United States District Court
for the District of Kansas
(D.C. No. 94-1301-WEB)**

———————————

Barry B. Langberg of Langberg, Cohn & Drooz, Los Angeles, California (Evan J. Olson of Hershberger, Patterson, Jones and Roth, Wichita, Kansas, with him on the brief) for Plaintiff-Appellant.

Joseph W. Kennedy of Morris, Laing, Evans, Brock & Kennedy, Wichita, Kansas, for Defendant-Appellee.

———————————

**Before ANDERSON, McWILLIAMS and ENGEL,[*] Circuit Judges.**

———————————

**ENGEL, Circuit Judge.**

———————————

> The Honorable Albert J. Engel, United States Circuit Judge for the Sixth Circuit Court of Appeals, sitting by designation.

_____

Plaintiff-Appellant Chase Morsey ("Morsey") appeals from various decisions of the district court in this diversity case for damages arising out of the operation of a water flood on a geological formation in Kansas known as the Rhodes Field, a common source of oil and gas. At issue is whether the court erred in (1) entering judgment as a matter of law against Morsey on grounds that he failed to present sufficient evidence of temporary damages to his leasehold; (2) granting summary judgment against him on his claim for punitive damages; and (3) granting summary judgment against him on his claim for damages inflicted on the leasehold before he acquired it. We affirm.

## FACTS

Although complicated in their detail, the facts of this case are, in all material respects, straightforward and undisputed. They are well set out in the pertinent decisions of the district court, which guide our reference to them here. As explained by the district court, the Rhodes Field produces oil and gas primarily from the Mississippian formation approximately 4,450 feet below ground level in Barber County, Kansas. It is a common source of oil supply subject to numerous leases. Morsey owns a lease on the Rhodes Field covering Section 20, Township 33 South, Range 20 West ("Section 20"). At the time he acquired his lease, Defendant-Appellee Chevron, USA, Inc. ("Chevron") owned several neighboring leases.

Section 20 was first developed by Conoco in the 1950's. By 1955, Conoco had drilled at least seventeen producing wells on it and had obtained an average production of about

2

14,000 barrels of oil per month. Production increased to over 17,000 barrels of oil per month by 1957, but then decreased sharply in subsequent years. By 1963, the average monthly production of oil on Section 20 was only about 3,700 barrels. As of 1957, Conoco had produced 1.1 million barrels of oil from the lease, which it estimated as approximately 70% of Section 20's primary recovery, and in 1958, it conducted a pilot water flood project on the lease to test secondary recovery prospects.

During the same period, other operators, including Barbara Oil Company ("Barbara"), Sinclair Oil & Gas Company ("Sinclair"), and Gulf Oil Corporation ("Gulf"), developed surrounding leases in Sections 16, 17, and 21 of the Rhodes Field (collectively the "Rhodes Unit"). Primary production on the Rhodes Unit peaked in 1955 at about 36,000 barrels of oil per month. Thereafter, production decreased sharply, and by 1962, it averaged approximately 6,000 barrels per month.

In response to declining bottom hole pressures and a corresponding decline in the rate of production, Conoco, Barbara, Gulf, Sinclair, and other operators agreed to undertake a cooperative water flood project of the Rhodes Field in 1963. Under the project, water was injected through pipes into the field to raise the pressure and make recoverable otherwise unrecoverable reserves. After initiation of the project, which was operated with the approval of the Kansas Corporation Commission ("KCC"), the rate of production on Section 20 increased in 1964 and 1965 and reached a high of about 8,000 barrels per month in 1966. It then began to decline again, decreasing to 4,000 barrels per month in 1968. By 1972,

3

production was 1,400 barrels per month. Similarly, production on the Rhodes Unit increased to 20,000 barrels per month in 1966 before declining to 13,000 barrels per month by 1968.

In 1966, Conoco sold Section 20 to Clinton Oil Company ("Clinton"). By the end of 1966, a cumulative total of 5.9 million barrels of water had been injected into the lease since the initiation of water flooding. Clinton continued operation of the water flood for several more years, and by 1971 a total of 9.5 million barrels of water had been injected into Section 20. Meanwhile, production of oil on the field continued to decline from an average of about 5,700 barrels per month in 1967 to 1,400 barrels per month in 1972. By that time, Clinton had plugged and abandoned nine producing and injection wells, as well as several water supply wells. In March of that year, it considered the producing wells to be "depleted" and ceased all injection efforts on Section 20.

Although Clinton ceased flooding Section 20 in 1972, the operators of the Rhodes Unit continued their secondary efforts after 1972, as permitted by the cooperative water flood agreement. By January 1973, the cumulative water injected into the Rhodes Unit since the inception of the project was in excess of fifty million barrels. Taking account of water recovered through production, thirty-seven million barrels were unaccounted for.

Clinton sold Section 20 to another operator in 1975; that operator held that lease until 1987. During that period, production declined from an average of about 700 barrels a month to about 300 barrels a month. In 1987, the lease was sold to Brito Oil Company, Inc. ("Brito"). During 1988, Section 20 produced approximately 280 barrels per month. By then,

the lease had produced a cumulative total of approximately 1.5 million barrels of oil. On January 9, 1989, Brito sold Section 20 to Morsey for $70,000, the approximate salvage value of the equipment on the lease. Subsequently, Morsey spent between $150,000 and $200,000 reworking that equipment.

Thereafter, Kewanee Oil Company, and then Gulf, acquired and operated the leases previously owned by Barbara and Sinclair. When Gulf merged with Chevron in 1984, Chevron acquired the Rhodes Unit leases and continued to flood them until 1989.

Sometime after Morsey purchased Section 20 in 1989, Richard Armer, who was employed by him to supervise the lease, complained to the KCC that Chevron was watering out the producing zone in Section 20 because "every time their injection pumps go down the fluid level drops very dramatically in my wells and my production increases drastically." A tracer test was undertaken to determine if there was communication of water from the Rhodes Unit to Morsey's lease, and the test revealed some communication between them. In October of 1989, Chevron ceased all fresh water injections and then sold the Rhodes Unit in 1992.

In August 1989, shortly before Chevron ceased injecting water into the Rhodes Field, Morsey began this action, charging that the water flood operated by Chevron and its predecessors-in-interest interfered with and damaged the oil producing capabilities of his lease. On April 16, 1991, he filed an amended complaint asserting causes of action for trespass, conversion, private nuisance, breach of contract, breach of duties owed to owners

5

of a common pool, and strict liability. His Amended Complaint alleges and seeks recovery for both permanent and temporary damages, as well as punitive damages and prejudgment interest.

As set out in the Pretrial Order, Morsey maintained that he was damaged by Chevron's water flood in two ways. First, he contended that it caused more than 1.2 million barrels of oil, valued at approximately $16,000,000, to become unrecoverable. Second, he urged that the water flood caused permanent damage "to the formation and the environment" in the Rhodes Field. Although he acquired his interest in Section 20 in 1989, Morsey submitted that his predecessors-in-interest assigned all of their rights to him and that he was therefore entitled to recover for damage done to the leasehold before as well as after he acquired it.

Chevron moved for summary judgment. First, it argued that Morsey's tort claims were barred by the limitations on actions in Kan. Stat. Ann. § 60-513. Second, it argued that Morsey could not recover for damage done to the leasehold before he acquired it because he was not the real-party-in-interest as to those injuries. Third, Chevron argued that he was precluded from recovering punitive damages by this Court's decision in *Tidewater Oil Co. v. Jackson*, 320 F.2d 157 (10th Cir.), *cert. denied*, 375 U.S. 942 (1963). Finally, it argued that Morsey was not entitled to prejudgment interest because his claim was unliquidated.

The district court granted the motion in part and denied it in part. It first narrowed Morsey's claim for damages. The court held that Chevron was entitled to summary judgment on Morsey's entire claim for permanent damages on grounds that they were barred by the

6

statute of repose in Kan. Stat. Ann. § 60-513(b). The court held that the statute of limitations in Kan. Stat. Ann. § 60-513(a) barred any claim for temporary damages inflicted more than two years before the filing of the complaint; however, it did not bar his claim for temporary damages done within two years of or after the filing of the complaint.

Second, the court held that Morsey was not entitled to recover for damages inflicted on the leasehold before he acquired it. It so reasoned on alternative grounds. First, it indicated that Morsey failed to show that the tort claims of his predecessors had been assigned to him. Second, it held that Kansas law prohibits the assignment of tort claims.

Next, the court entered summary judgment against Morsey on his claim for breach of the cooperative water injection agreement under which the operators agreed to flood the Rhodes Field. It held that Morsey could not assert a claim for breach of the agreement because when his predecessor Clinton ceased its injection efforts on Section 20 the agreement terminated as to Clinton, taking it out of position to bring an action against the other parties to the agreement for their failure to perform according to its terms. As Clinton's assignee, the court indicated, Morsey stood in no better position. Alternatively, the court concluded that the claim was barred by the five-year statute of limitations in Kan. Stat. Ann. § 60-511.

Finally, the court held that Chevron was entitled to summary judgment on Morsey's claim for punitive damages but not on his request for prejudgment interest. According to the

court, his claim for punitive damages was barred by this Court's decision in *Tidewater*. An award of prejudgment interest was within the discretion of the trier of fact, the court said, and thus inappropriate for resolution on summary judgment.

The case proceeded to trial before a jury on Morsey's remaining claims--those for temporary damages inflicted on Section 20 after he acquired it. At the close of his case-in-chief, Chevron moved for a judgment as a matter of law on grounds that Morsey had failed to adduce sufficient evidence of temporary damages and that his claims were barred by the statute of limitations. The court took the motion under submission, pending presentation of Chevron's case. After hearing all the evidence, the court orally (and later in writing) granted the motion and entered judgment for Chevron as a matter of law. The court concluded that Morsey failed to adduce adequate evidence of temporary damages: he failed to prove that it was economically feasible to remove sufficient water from the leasehold to permit recovery of the oil allegedly trapped in it. The evidence showed only permanent damages, the court held, which were barred by its ruling on summary judgment.

Morsey timely appealed.

## DISCUSSION

Under Kansas law, a leaseholder is entitled to a remedy for wrongful interference with his or her interest in the leasehold. In the proper case, the owner of a lease may obtain relief for interference with and damages to the oil producing capabilities of his or her lease.

8

Morsey raises essentially three arguments against the district court's determination that this is not a case in which he, as the leaseholder of Section 20, is entitled to relief for Chevron's alleged interference with and damages to the oil producing capabilities of that lease. First, he argues that the district court erred in holding that he presented insufficient evidence of temporary damages. Next, he contends that the court erred in holding that he was not entitled to punitive damages. Finally, he maintains that the court erred in holding that his acquisition of Section 20 did not constitute a valid and complete transfer to him of his predecessors' rights to sue for injury to the leasehold.

## I

We first consider Morsey's claim that he presented sufficient evidence of temporary damages. In support of that claim, he makes six related arguments: (1) Kansas law does not impose on him the burden to produce evidence of cost remediation to sustain his claims for temporary damages; (2) he satisfied his burden of proof under Kansas law by establishing an ongoing and continuous injury and proving the water flood abatable; (3) he provided a reasonable basis for calculating his temporary damages; (4) he submitted evidence permitting an inference that remediation of the leasehold is cost-effective; (5) Chevron had the burden to prove that remediation efforts are not cost-effective; and (6) the court should have allowed him to reopen his case-in-chief to provide additional evidence of the cost-effectiveness of remediation.

9

A judgment as a matter of law is appropriate when a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on the issue. Fed. R. Civ. P. 50(a);*Honce v. Vigil*, 1 F.3d 1085, 1088 (10th Cir. 1993). An order entering judgment as a matter of law is reviewed de novo. *Hinds v. General Motors Corp.*, 988 F.2d 1039, 1045 (10th Cir. 1993). In our view, the district court did not err in entering judgment as a matter of law against Morsey on his claim for temporary damages.

As we explained in *Miller v. Cudahy Co.*, 858 F.2d 1449, 1455 (10th Cir. 1988), *cert. denied*, 492 U.S. 926 (1989), "[d]rawing a distinction between permanent and temporary damages . . . is at best problematical." While "`no hard and fast rule can be adopted as to when . . . damages are deemed permanent and when they are deemed temporary,'" the distinction "remains a viable concept." *Id.* at 1453 (quoting *Olson v. State Highway Comm'n of Kan.*, 679 P.2d 167, 172 (Kan. 1984)).

The Supreme Court of Kansas outlined the contours of these damages in its decision in *McAlister v. Atlantic Richfield Co.*, 662 P.2d 1203 (Kan. 1983). According to the court in *McAlister*,

> Temporary damages or continuing damages limit recovery for injury that is intermittent and occasional and the cause of the damages remediable, removable, or abatable. Damages are awarded on the theory that cause of the injury may and will be terminated. Temporary damages are defined as damages to real estate which are recoverable from time to time as they occur from injury.

10

> Permanent damages are given on the theory that the cause of injury is fixed and that the property will always remain subject to that injury. Permanent damages are damages for the entire injury done--past, present, and prospective--and generally speaking those which are practically irremediable. If an injury is permanent in character, all the damages caused thereby, whether past, present, or prospective, must be recovered in a single action.

*Id.* at 1212 (citations omitted); *see Gowing v. McCandless*, 547 P.2d 338 (Kan. 1976).

Our review of the record indicates that Morsey may have presented evidence sufficient to prove permanent damages to Section 20. But, as noted above, the district court held that any claim for permanent damages was barred by the statute of repose in § 60-513(b), and Morsey has not challenged that ruling on appeal. Only his claim for temporary damages survived summary judgment, and proof of permanent damages is no substitute for proof of temporary damages.

As plaintiff, Morsey bore the burden to prove temporary damages, if any, to his leasehold. Temporary damages are, as indicated above, for injuries that are intermittent and occasional; unlike permanent damages, they are remediable, removable, or abatable. Morsey appears to take the position that so long as he showed that any damages to Section 20 might be remedied, removed, or abated, he carried his burden of proof on the matter. However, proof of temporary damages requires more. Inherent in the concept of temporary damages is a element of feasibility, comprised of (but not limited to) both economic and temporal concerns. *See Miller*, 858 F.2d at 1454-55; *McAlister*, 662 P.2d at 1212; *Gowing*, 547 P.2d at 343. Temporary damages are distinguished from permanent damages at least in important

11

part because the former may be remedied, removed, or abated within a reasonable period and at a reasonable expense, whereas the latter cannot be.

Morsey presented evidence revealing the possibility of remediation, removal, or abatement of the cause of the alleged injury to Section 20. He adduced evidence that the water on his leasehold would ultimately abate and that remediation efforts similar to those required on Section 20 were being done in other areas. While helpful to his cause, that evidence fell short of sustaining that cause. Morsey failed to show that the water interfering with the recovery of oil on Section 20 could be remedied, removed, or abated within a reasonable time and at reasonable expense. He did too little to distinguish those damages from the permanent damages barred by § 60-513(b). Proof of temporary damages requires more. Possibilities are not proof, and as Chevron points out, speculation and conjecture are no substitute for evidence.

We divine no error in the district court's refusal to allow Morsey to reopen his case to submit additional proof of temporary damages. A motion to reopen a case to receive additional evidence is committed to the sound discretion of the trial court and will be reversed only for abuse of discretion. *Sanders v. International Ass'n of Bridge, Structural & Ornamental Iron Workers*, 546 F.2d 879, 882 (10th Cir. 1979). Morsey's request came too late in the day and with too little to recommend it to merit interference with the exercise of the district court's discretion.

Morsey's challenge to the district court's decision on temporary damages must therefore fail. Accordingly, the court's decision granting Chevron's motion for judgment as a matter of law is affirmed.

**II**

Next, we consider Morsey's claim that he was entitled to a jury determination on his claim for punitive damages. He contends that in barring his claim for punitive damages, the district court misplaced reliance on this Court's decision in *Tidewater*. According to Morsey, under the Kansas Supreme Court's more recent decisions in *Folks v. Kansas Power & Light Co.*, 755 P.2d 1319 (Kan. 1988), and *Glynos v. Jagoda*, 819 P.2d 1202 (Kan. 1991), he is entitled to a jury determination on punitive damages, because he presented evidence of Chevron's reckless indifference to his property rights.

Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Quaker State Minit-Lube, Inc. v. Fireman's Fund Ins. Co.*, 52 F.3d 1522, 1526 (10th Cir. 1995). "We review the district court's grant of summary judgment de novo, applying the same legal standard used by the district court." *Frandsen v. Westinghouse Corp.*, 46 F.3d 975, 977 (10th Cir. 1995). In our view, the district court did not err in granting summary judgment against Morsey on his claim for punitive damages.

Under our decision in *Tidewater*, which anticipates the Kansas courts' attitude toward the availability of punitive damages under circumstances similar to those here, Morsey's

13

claim for punitive damages must fail. In *Tidewater*, we held that under Kansas law, punitive damages are not available for a legalized trespass or nuisance. 320 F.2d at 165. We doubt whether *Folks* and *Glynos* call *Tidewater* into question or command a different result. *Fransen v. Conoco, Inc.*, 64 F.3d 1481, 1492-93 & n.11 (10th Cir. 1995) (citing *Tidewater* with approval), *cert. denied*, 116 S. Ct. 1060 (1996). Nevertheless, we need not resolve the matter.

Morsey's failure to prove actual damages short-circuits his claim for punitive damages. In Kansas, actual damages are a prerequisite to punitive damages. *Enlow v. Sears, Roebuck & Co.*, 822 P.2d 617, 624 (Kan. 1991); *Lantz v. City of Lawrence*, 657 P.2d 539, 545 (Kan. 1983). As discussed above, Morsey failed to prove actual, temporary damages, and his claim for permanent damages was barred by § 60-513(B). Thus, the court did not err in holding that he was not entitled to punitive damages. Accordingly, the decision of the district court granting summary judgment on Morsey's claim for punitive damages is affirmed.

## III

Finally, we consider Morsey's claim that his acquisition of Section 20 included a valid and complete transfer to him of his predecessors' rights to sue for injury to the property. In support of the claim, Morsey advances five arguments that can fairly be reduced to two. First, he contends that he received his leasehold by way of an all-inclusive assignment

14

encompassing his predecessor's rights to sue for damage to the leasehold. Second, he argues that Kansas law permits the assignment to him of his predecessors' tort claims.

As indicated above, summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Quaker State Minit-Lube*, 52 F.3d at 1526. Here too, the district court's grant of summary judgment is reviewed de novo. *Frandsen*, 46 F.3d at 977. As with the previous claim, the district court did not err in granting summary judgment against Morsey on his claim for damages inflicted on the leasehold before he acquired it.

Morsey's failure to prove temporary damages to Section 20 after he acquired it, discussed above, bodes poorly for his ability to prove temporary damages to the leasehold within the statutory period before he acquired it. However, his failure of proof as to the one does not signal as a matter of law a failure of his proof as to the other. Damages inflicted on Section 20 before Morsey acquired it were not in issue at the trial in this matter. Thus, they are not barred by the district court's decision granting judgment as a matter of law with respect to those damages that were at issue. Our affirmance of the district court's decision on temporary damages does not therefore dispose of Morsey's claim for such damages during the period before he acquired the leasehold. Rather, that claim requires consideration on the merits.

Assuming without deciding that Morsey acquired his leasehold by an assignment broad enough to include his predecessors' causes of action as to Section 20, he cannot recover

15

for injuries inflicted on the leasehold before he acquired it. Any tort for damages done to the leasehold before he acquired it belonged to his predecessors-in-interest and lapsed when they transferred it. In Kansas, tort claims such as those in question are unassignable. *E.g.*, *Heinson v. Porter*, 772 P.2d 778, 783-85 (Kan. 1989), *overruled in part on other grounds by Glenn v. Fleming*, 799 P.2d 79 (Kan. 1990); *Howe v. Mohl*, 214 P.2d 298, 300 (Kan. 1950); *Star Mfg. Co. v. Mancuso*, 680 F. Supp. 1496, 1499 (D. Kan. 1988); *see Bank IV Wichita, Nat'l Ass'n v. Arn, Mullins, Unruh, Kuhn & Wilson*, 827 P.2d 758, 764 (Kan. 1992); *Cullen v. Atchison, Topeka, & Sante Fe Ry.*, 507 P.2d 353, 360 (Kan. 1973). Thus, Morsey's acquisition of Section 20 did not include an assignment of his predecessors' causes of action.

It follows that the district court did not err in holding that Morsey could not pursue a claim for damages inflicted on Section 20 before he acquired it. Accordingly, his challenge to the court's ruling must fail, and the court's grant of summary judgment against him on this claim is affirmed.

## CONCLUSION

For the reasons stated, the decisions of the district court are affirmed.