**Virginia K. WEATHERS, Plaintiff,**

v.

**AMERICAN FAMILY MUTUAL INSURANCE COMPANY, et al., Defendants.**

**Civ. A. No. 87–2557–O.**

United States District Court,
D. Kansas.

May 21, 1992.

---

Pedro L. Irigonegaray, Irigonegaray & Associates, Topeka, Kan., for plaintiff.

N. Jack Brown, Boddington & Brown, Chtd., Kansas City, Kan., Kent M. Bevan, Dysart, Taylor, Penner, Lay & Lewandowski, Kansas City, Mo., for defendant American Family Mut. Ins.

Mark S. Braun, Office of Atty. Gen., Topeka, Kan., for defendant Richard J. Blevins.

Wilburn Dillon, Jr., Bennett, Dillon & Callahan, Topeka, Kan., for defendant Zenith Electronic Corporation.

## MEMORANDUM AND ORDER

EARL E. O'CONNOR, District Judge.

This matter is before the court on defendant American Family Mutual Insurance Company's ("AFM's") motion for judgment notwithstanding the verdict, or in the alternative, to alter or amend a judgment, or in the alternative, for remittitur, or in the alternative, for new trial (Doc. # 1008). Having reviewed the motion, the court is now prepared to rule.

### I. Background

The court will briefly summarize the background of this case.[1] Plaintiff Virginia Weathers is a resident of Topeka, Kansas. In the late evening hours of November 12, 1986, and the early morning hours of November 13, 1986, plaintiff's home was extensively damaged by fire. Following the fire, investigations were conducted by defendant Richard Blevins, a fire investigator for the state fire marshal's office, and Steve Thompson, an AFM investigator.

In May of 1987, approximately five months after the fire, defendant AFM denied plaintiff's claim for benefits under her homeowner's insurance policy. As justification for the denial, AFM claimed that the fire was intentionally set and that plaintiff was involved in setting the fire with the intent to cause the loss of her dwelling and belongings. Additionally, AFM informed plaintiff that she had committed numerous other breaches of her homeowner's insurance policy.

In June of 1987, the State of Kansas filed criminal charges consisting of two counts of aggravated arson against the plaintiff. Plaintiff's criminal trial was conducted in the fall of 1987. After two and one-half weeks of trial, plaintiff was acquitted by the jury. Following her acquittal,

---

1. In so doing, the court makes no attempt to outline the enormous amount of evidence presented at trial. Rather, in discussing each of AFM's arguments, the court will review and discuss relevant portions of the evidence.

plaintiff filed this lawsuit against the defendants seeking money damages.

Plaintiff asserted three separate claims against her insurer, defendant AFM: (1) breach of contract; (2) outrage; and (3) malicious prosecution.[2] With respect to defendant Blevins, plaintiff alleged that Blevins was grossly negligent in the investigation of the fire. Finally, with respect to defendant Zenith, plaintiff asserted alternative claims of negligence and strict liability.[3]

This case was tried to a jury beginning April 8, 1991, until June 21, 1991. The jury returned a verdict in favor of plaintiff on all of her claims against defendant AFM, and awarded plaintiff $6,192,072.00 in total damages.[4] The jury found against plaintiff on her claims against defendants Blevins and Zenith.

## II. Standards

The standard for granting a motion for judgment notwithstanding the verdict is precisely the same as the standard for directing a verdict. *Hurd v. American Host and Derrick Co.*, 734 F.2d 495, 499 (10th Cir.1984). In considering a motion for judgment notwithstanding the verdict, the evidence must be viewed in the light most favorable to the party against whom the motion is made. *Downie v. Abex Corp.*, 741 F.2d 1235 (10th Cir.1984). It is not the court's duty to weigh the evidence presented, or to pass upon the credibility of witnesses, or to substitute its judgment of the facts for that of the jury. *Lucas v. Dover Corp., Norris Div.*, 857 F.2d 1397, 1400 (10th Cir.1988). A judgment notwithstanding the verdict is cautiously and sparingly granted when the court is certain the evidence "conclusively favors one party such that reasonable men would not arrive at a contrary verdict." *Western Plains Service*

*Corp. v. Ponderosa Development Corp.*, 769 F.2d 654, 656 (10th Cir.1985). Finally, a motion for judgment notwithstanding the verdict may not be granted unless the evidence points but one way and is susceptible to no reasonable inferences which may sustain the position of the party against whom the motion is made. *E.E.O.C. v. Univ. of Oklahoma*, 774 F.2d 999, 1001 (10th Cir. 1985), *cert. denied*, 475 U.S. 1120, 106 S.Ct. 1637, 90 L.Ed.2d 183 (1986).

Motions for new trial are committed to the sound discretion of the trial court. *McDonough Power Equipment, Inc. v. Greenwood*, 464 U.S. 548, 556, 104 S.Ct. 845, 850, 78 L.Ed.2d 663 (1984); *Brownlow v. Aman*, 740 F.2d 1476, 1491 (10th Cir. 1984). In reviewing a motion for new trial the court must view the evidence in the light most favorable to the prevailing party. *Joyce v. Davis*, 539 F.2d 1262, 1264 (10th Cir.1976). Moreover, the court should abide by the principle "that courts should exercise judgment in preference to the automatic reversal for 'error' and ignore errors that do not affect the essential fairness of the trial." *McDonough Power Equipment, Inc.*, 464 U.S. at 553, 104 S.Ct. at 848. Error in the admission or exclusion of evidence, and no error in ruling or order of the court or anything done or omitted by the court can be grounds for granting a new trial unless the error defect affects the substantial rights of the parties. *Rasmussen Drilling, Inc. v. Kerr–McGee Nuclear Corp.*, 571 F.2d 1144, 1148–49 (10th Cir. 1978), *cert. denied*, 439 U.S. 862, 99 S.Ct. 183, 58 L.Ed.2d 171 (1978); Fed.R.Civ.P. 61. "The party seeking to set aside a jury verdict must demonstrate trial error which constitutes prejudicial error or that the verdict is not based on substantial evidence." *White v. Conoco Inc.*, 710 F.2d 1442, 1443 (10th Cir.1983).

2. Plaintiff's fourth claim against AFM, for trespass, was dismissed by plaintiff at the time of trial.

3. Both of plaintiff's claims against Zenith were based upon the allegation that a Zenith television set caused the fire at plaintiff's home.

4. The court later reduced the actual damages by $3,000.00, pursuant to the agreement of plaintiff

and AFM, to reflect a payment AFM made to plaintiff shortly after the fire as an advance on her personal property coverage. The court also awarded $1,250,000.00 in punitive damages on the malicious prosecution claim pursuant to K.S.A. 60–3701. These changes brought the total judgment to $7,439,072.00, exclusive of attorneys' fees. *See Weathers v. American Family Mut. Ins. Co.*, 777 F.Supp. 879 (D.Kan.1991).

*III. Discussion*

 A. Motion for judgment notwithstanding the verdict.

In its motion, AFM contends that it is entitled to a judgment notwithstanding the verdict "for several reasons." The court will discuss each of AFM's contentions in the order in which they are presented in the motion.

 1. *Overlap of plaintiff's theories of malicious prosecution and outrage.*

AFM contends that plaintiff's malicious prosecution and outrage claims overlap and resulted in a "partial double recovery" of actual damages. In support of this contention, AFM asserts that the "major element" of plaintiff's outrage claim was AFM's institution of criminal proceedings against the plaintiff. Accordingly, AFM argues, "[w]here ... an established tort is alleged which, by definition, includes that outrageous conduct claimed by the plaintiff, the separate tort of outrage is not appropriate and is subsumed within the established tort." Alternatively, AFM argues that the court's instructions to the jury erroneously allowed the jury to award plaintiff duplicative damages on the outrage and malicious prosecution claims.

■ The court first turns to the question of whether plaintiff's outrage claim was subsumed by her malicious prosecution claim. Critical in this determination, the court believes, are the operative facts underlying each of plaintiff's tort claims. Viewed on a time line, the operative facts underlying plaintiff's outrage claim began on November 13, 1986, when AFM investigator Steve Thompson arrived on the fire scene and announced that his job was "to put people in jail," and continued until well after plaintiff's acquittal. In contrast, the operative facts underlying the malicious prosecution claim occurred during a different, and shorter, period of time—from approximately June of 1987, when criminal

charges were instituted, until November of 1987, when plaintiff was acquitted. Although the conduct of AFM that gave rise to the malicious prosecution claim was *possibly* considered by the jury as a "subset" of the conduct giving rise to the outrage claim, the court does not believe that this precludes plaintiff from recovering under both claims.[5]

Defendant AFM has cited several cases which it claims support its subsumption argument. The court has reviewed these cases and finds them distinguishable from the case at hand. Specifically, in each of the cases cited by AFM, the plaintiffs were attempting to seek "identical relief" under multiple theories of recovery which were based on "the same, identical, operative facts...." *Clappier v. Flynn*, 605 F.2d 519, 531 (10th Cir.1979); *see Wood v. Hustler Magazine, Inc.*, 736 F.2d 1084, 1089–92 (5th Cir.1984) (holding that, under Texas law, plaintiff whose privacy has been invaded can have only one recovery if alternative causes of action contain identical elements of damages flowing from the same publication), *cert. denied*, 469 U.S. 1107, 105 S.Ct. 783, 83 L.Ed.2d 777 (1985); *Braun v. Flynt*, 726 F.2d 245, 251 (5th Cir.1984) (holding that plaintiff could not recover for the same embarrassment and humiliation caused by the publication of her photograph in a magazine under both defamation and invasion of privacy theories), *cert. denied*, 469 U.S. 883, 105 S.Ct. 252, 83 L.Ed.2d 189 (1984); *Greenwood Ranches, Inc. v. Skie Constr. Co.*, 629 F.2d 518, 521 (8th Cir.1980) (holding that plaintiff's causes of action were "simply alternate theories for seeking the same relief."); *Stewart v. Thomas*, 538 F.Supp. 891, 896–97 (D.C.Cir.1982) (holding that plaintiff's claim of intentional infliction of emotional distress was subsumed by plaintiff's Title VII claim); *Therrell v. Fonde*, 495 So.2d 1046, 1048 (Ala.1986) (court did not reach subsumption issue); *Jonap v. Silver*, 1 Conn.App. 550, 474 A.2d 800, 807 (1984)

---

5. At the time of trial, the court found that plaintiff's outrage claim accrued prior to July 1, 1987, although actionable outrageous conduct on the part of AFM continued long thereafter. The court was required to make this finding in

order to determine whether tort reform legislation effective July 1, 1987, was applicable to plaintiff's outrage claim. Upon review, the court affirms this finding. *See* 1 Am.Jur.2d *Actions* § 88.

(holding that separate verdicts for both invasion of privacy by appropriation and invasion of privacy by false light amounted to an improper duplication of damages where the wrong complained of by the plaintiff constituted a single transaction); *Munsell v. Ideal Food Stores*, 208 Kan. 909, 494 P.2d 1063, 1075 (1972) (holding that claims for invasion of right of privacy and for libel and slander arose from the same alleged wrongful act on the part of the defendant); *Huggins v. Kansas Power & Light Co.*, 164 Kan. 27, 187 P.2d 491, 495 (1947) (holding that personal injuries sustained in an automobile collision gave rise to only one cause of action for damages); *Rice v. Janovich*, 109 Wash.2d 48, 742 P.2d 1230, 1238 (1987) (holding that plaintiff who recovered civil damages under assault theory could not also recover damages arising from tort of outrage in connection with the same conduct). Here, as the court has already noted, plaintiff's outrage claim accrued at least five months prior to the accrual of her malicious prosecution claim. Although there may have been an overlap of certain operative facts at the time of trial (AFM's course of misconduct occurring between June and November of 1987), plaintiff's outrage and malicious prosecution claims were based on substantially different sets of facts.[6] Moreover, plaintiff's outrage and malicious prosecution claims did not seek "identical relief...."[7] *Clappier*, 605 F.2d at 531. Accordingly, plaintiff's outrage and malicious prosecution claims were clearly not "alternative theories of recovery ..."

More analogous and persuasive on the subsumption issue, the court believes, is *Taiwo v. Vu*, 249 Kan. 585, 822 P.2d 1024 (1991), a recent Kansas Supreme Court decision which discussed at length the tort of outrage. In *Taiwo*, plaintiffs Sherry and Obafemi Taiwo brought a civil action against defendant Vu to recover for assault, battery, false imprisonment, and outrage. The action was based upon defendant Vu's course of misconduct over a period of approximately three weeks. During that time period, defendant Vu: (1) assaulted and battered Mrs. Taiwo; (2) locked Mrs. Taiwo inside of a room for a short period of time; (3) made false accusations to the police about Mr. Taiwo; (4) filed a false police report against both of the plaintiffs; and (5) induced a third-party to make false accusations to the police concerning the plaintiffs. At trial, the jury found for the plaintiffs on all four of their claims, awarded $20,000.00 in damages, and found that the trial court should be permitted to impose punitive damages. After a hearing pursuant to K.S.A.1990 Supp. 60–3702, the trial court assessed $3,000.00 in punitive damages against defendant Vu.

On appeal, Vu asserted that the plaintiffs had failed to prove that her conduct was extreme and outrageous. In rejecting this argument, the Kansas Supreme Court outlined the conduct on the part of Vu which gave rise to the plaintiff's outrage claim:

> The uncontested evidence reflects that [Vu's] behavior was intentional and malicious: she assaulted, battered, and falsely imprisoned Mrs. Taiwo; she first lied to a law enforcement officer when she called the police and then she lied to Officer Baldwin, both times claiming Mr. Taiwo had vandalized her van; she filed a false police report against the Taiwos concerning her Cadillac; Ms. Vu then induced an employee to lie to the police about the Taiwos' involvement in vandalism and when she was confronted, she challenged Detective Rollwagen to prove the Taiwos had not committed the vandalism.

*Id.* at 593, 822 P.2d at 1029–30. Although Vu did not specifically raise a subsumption argument, the clear import of the above-cited language is that an outrage claim is properly asserted notwithstanding the fact that a portion of the operative facts on

---

**6.** Actually, most, if not all, of the misconduct that occurred prior to June of 1987 was unrelated to the malicious prosecution claim. Likewise, all misconduct subsequent to plaintiff's acquittal was unrelated to the malicious prosecution claim.

**7.** The court will discuss the elements of damages for each claim below.

which it is based give rise to a separate cause of action in tort.

Assuming, for purposes of argument, that there was an overlap of operative facts in the instant case, the court finds that plaintiff's outrage claim was not subsumed by her malicious prosecution claim. *See id.; see also Cole v. Control Data Corp.,* 947 F.2d 313, 320–21 (8th Cir.1991) ("A plaintiff may ... recover damages on two separate causes of action if the damages result from separate injuries."); *Gilardi v. Schroeder,* 672 F.Supp. 1043, 1047 (N.D.Ill.1986) (awarding damages for battery and intentional infliction of emotional distress claims that arose out of defendant's course of misconduct), *aff'd,* 833 F.2d 1226 (7th Cir.1987). To conclude otherwise would result in substantial hardship to the plaintiff. Specifically, plaintiff would be left without a legal remedy for a substantial portion of AFM's misconduct. Such a result is unacceptable.[8]

In conclusion, the court finds that, in cases like *Taiwo* and the instant case, the only rational solution is to allow the plaintiff to proceed on all claims and properly instruct the jury so that they do not award duplicative damages in the event that the plaintiff prevails on more than one claim.

■ The court now turns to the question of whether the jury instructions erroneously allowed the jury to award duplicative damages for plaintiff's claims of malicious prosecution and outrage. In support of its contention that plaintiff was allowed to recover duplicative damages, defendant AFM cites Instruction No. 23, which stated:

### INSTRUCTION NO. 23

If you find for the plaintiff on her claim of outrage or malicious prosecution against American Family, you will then determine the amount of her actual dam-ages. You should allow her such amount of money as will reasonably compensate her for the damage resulting from the wrongful conduct of the defendant. You may take into consideration any mental pain and suffering, humiliation and embarrassment to which she was subjected, and also her alleged cost of criminal defense and loss of net business income shown by the evidence. The amount to be awarded rests within your sound discretion.

Had this been the only instruction given to the jury on the issue of liability and damages, AFM's argument might be persuasive. What AFM conveniently ignores, however, is that Instruction No. 23, which was intended as a general instruction on the issue of damages, was given in conjunction with Instruction No. 14, which highlighted the issue of liability in an outrage claim, and Instruction No. 42a, which was specifically designed to prevent the double recovery of damages:

### INSTRUCTION NO. 14 [9]

Plaintiff also seeks to recover against American Family for what is known in the law as the tort of outrage. This means that one who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress and bodily harm, if any, resulting from the emotional distress.

### INSTRUCTION NO. 42a [10]

Plaintiff cannot make more than one recovery for the same element of damage even though she brings separate causes of action against a party or separate claims for that element of damage

---

8. Equally unacceptable would be a finding that plaintiff's malicious prosecution claim was subsumed by the outrage claim. Clearly, as noted by plaintiff in her response to the instant motion, defendant AFM could not "be held liable for the emotional distress associated with being prosecuted, *if* it were not liable for malicious prosecution." (emphasis in original).

9. The court has only quoted a portion of Instruction No. 14. The remaining portions of the instruction set forth the necessary elements of an outrage claim.

10. The court notes, as has the plaintiff, that defendant AFM participated in a joint preparation of Instruction No. 42a.

against multiple parties. However, if you determine one element of damage is caused by more than one defendant or is attributable to more than one cause of action, the monetary award can be divided appropriately.

Additionally, the verdict form mirrored these instructions and provided further guidance to the jury in assessing damages with respect to plaintiff's outrage and malicious prosecution claims. *See Causey v. Zinke (In re Aircrash in Bali, Indonesia)*, 871 F.2d 812, 814 (9th Cir.1989) ("In deciding whether the jury was misled, the court should also consider the guidance to the jury provided by the verdict form."), *cert. denied*, 493 U.S. 917, 110 S.Ct. 277, 107 L.Ed.2d 258 (1989). Specifically, the verdict form required the jury to answer the following questions:

**OUTRAGE CLAIM AGAINST AMERICAN FAMILY:**

(6) Do you find from a preponderance of the evidence that plaintiff is entitled to recover on her claim of outrage against defendant American Family for extreme emotional distress?

YES ____ NO ____

Note: If you answered "NO" to Question (6), please proceed to Question (9).

(7) If you answered "YES" to Question (6), what amount of actual damages do you find that the plaintiff is entitled to recover from defendant American Family with respect to her claim of outrage?

$____

(8) If you awarded the plaintiff actual damages in Question (7), what amount of punitive damages, if any, do you find should be assessed against defendant American Family with respect to plaintiff's claim of outrage?

$____

**MALICIOUS PROSECUTION CLAIM AGAINST AMERICAN FAMILY:**

(9) Do you find, from a preponderance of the evidence, that the plaintiff is entitled to recover on her claim of malicious prosecution against defendant American Family?

YES ____ NO ____

Note: If you answered "NO" to Question (9), please proceed to Question (12).

(10) If you answered "YES" to Question (9), what amount of actual damages do you find that the plaintiff is entitled to recover from defendant American Family with respect to her claim of malicious prosecution?

| | |
|---|---|
| Cost of criminal defense | $____ |
| Loss of net business income | $____ |
| Emotional distress | $____ |
| TOTAL | $____ |

(11) If you awarded the plaintiff actual damages in Question (10), do you find, by clear and convincing evidence, that the plaintiff is entitled to punitive damages with respect to her malicious prosecution claim?

YES ____ NO ____

Note: If you answered "YES" to Question (11), the court will determine the amount of punitive damages that should be imposed against defendant American Family with respect to plaintiff's malicious prosecution claim.

Reviewing the jury charge in its entirety, *see Street v. Parham*, 929 F.2d 537, 539 (10th Cir.1991) (holding that instructions are to be reviewed as a whole), the court finds that the jury was given a proper understanding of the issues and its duty to decide those issues and was not allowed to award duplicative damages on plaintiff's outrage and malicious prosecution claims. Accordingly, the court finds that defendant AFM suffered no prejudice as a result of the jury instructions. *Id.; see also Horton v. Buhrke*, 926 F.2d 456, 460 (5th Cir.1991).

Finally, the court rejects AFM's contention that "the punitive damage awards on both claims were clearly based on the same conduct and clearly arose from the same facts." For the reasons stated above, the court finds that plaintiff's outrage and malicious prosecution claims were separate and distinct theories of recovery and were based on substantially different operative facts. Moreover, at the time the court determined the amount of punitive damages to assess with respect to plaintiff's malicious prosecution claim, the court

took into consideration the amount awarded by the jury with respect to plaintiff's outrage claim. Accordingly, the two punitive damage awards are not duplicative.

### 2. Does the jury verdict reflect bias, passion and prejudice?

Defendant AFM attacks the jury award contending that it is "grossly excessive" and "can only be explained on the basis of bias, passion and prejudice." In support of this contention, AFM points to several alleged discrepancies in the verdict. AFM also attacks the verdict in its entirety. The court will review these arguments in order.

██ AFM first questions the $3,500,-000.00 amount awarded by the jury pursuant to plaintiff's outrage claim. Specifically, AFM contends that the jury must not have intended the amount to compensate plaintiff for emotional distress because the amount is not reflected in the jury's response to Question 18 in the verdict form, which asked the jury what total amount they determined that plaintiff was entitled to recover from AFM for "emotional distress." The court cannot agree with AFM's contention. Instruction No. 14 and the verdict form clearly explained to the jury that any damages awarded pursuant to plaintiff's outrage claim were to compensate her for "severe" or "extreme" emotional distress and any resulting physical harm. Although the jury failed to include the outrage award in their response to Question 18, the court believes, as suggested by plaintiff, that this was simply the result of the jury's literal reading of the verdict form. On certain of the claims (e.g., malicious prosecution claim against AFM, gross negligence claim against Blevins), the verdict form listed specific categories of damages including "emotional distress." In contrast, Question 7 simply asked the jury "what amount of actual damages do you find that the plaintiff is entitled to recover from defendant [AFM] with respect to her claim of outrage?" Accordingly, when the jury responded to Question 18, they undoubtedly did not realize that they were to include the amount awarded for "outrage" in Question 7.[11] Alternatively, the jury may have distinguished "severe" or "extreme" emotional distress from "emotional distress." Either of these scenarios furnishes a reasonable explanation for the alleged discrepancy. The court therefore finds no reason to believe that the outrage award was meant to compensate plaintiff for anything other than extreme emotional distress and resulting bodily harm.

██ AFM next challenges the amount awarded by the jury, pursuant to plaintiff's malicious prosecution claim, for the cost of plaintiff's criminal defense. Specifically, AFM complains that the jury awarded plaintiff $60,000.00 when the evidence indicated that the cost was actually $58,942.43. Because the evidence does not completely support the amount awarded by the jury on this element of damages, the court will grant a remittitur in the amount of $1,057.57 so that the verdict conforms with the statement of charges introduced by the plaintiff into evidence. See plaintiff's exhibit # 6. However, the court finds no reason to believe, as suggested by AFM, that the discrepancy between the award and the evidence suggests bias, passion or prejudice on the part of the jury.

██ At trial, plaintiff claimed that defendant Blevins was grossly negligent in the investigation of the fire.[12] The jury, however, found against plaintiff on this claim. AFM now asserts that the jury's finding in favor of defendant Blevins was inconsistent with their findings against AFM. The court disagrees. A review of the evidence presented at trial demonstrates that the critical difference between the jury's findings was the nature of the conduct of each of these defendants. Although the evidence indicated that Blevins may have acted negligently in his investigation of the fire, there was no evidence indicating that he acted wantonly, as would

---

11. A portion of the outrage award was arguably attributable to plaintiff's physical suffering.

12. The court held that plaintiff was prohibited under Kansas law from suing Blevins for simple negligence.

have been necessary for the jury to have found him liable. In contrast, the evidence demonstrated, in clear and convincing fashion, that AFM's conduct was wanton, willful and malicious. Thus, although AFM and Blevins may have reached similar conclusions about the cause of the fire, their conduct in reaching those conclusions was substantially different. Further, the attitude and demeanor of these two defendants before and at the time of trial was markedly different. After hearing the evidence presented by plaintiff, including critical pieces of evidence that he had ignored or overlooked during his investigation, Blevins all but retracted his opinion that the fire was incendiary in origin, testifying that he would have to "reevaluate" his conclusions about the fire. In contrast, AFM insisted before and throughout the trial, in the face of overwhelming evidence to the contrary, that the fire was incendiary. Finally, as pointed out by plaintiff in her response, it was her position throughout the trial that "Blevins, although negligent, was following the lead of Steve Thompson." Although not specifically reflected in the jury's findings, the court believes that there was sufficient evidence from which the jury could have reached this same conclusion.

■ AFM also contends that the entire verdict is an "enigma" because the jury concluded that the fire was not incendiary in origin, yet determined "that the television set was not responsible for causing the fire." The court rejects this argument as well. Clearly, the jury concluded that the fire was not intentionally set.[13] Although the jury found against plaintiff on her product liability claims against Zenith, this does not necessarily lead to the conclusion that the television set did not cause the fire. Rather, there appear to be two alternative explanations inherent in the verdict: (1) the jury believed that the tele-

vision set started the fire but did not believe that plaintiff had met her burden of proof on the product liability claims against Zenith; or (2) the jury believed that the fire was caused by an accidental source other than the television set. Either way, the verdict is hardly an "enigma."

■ AFM next argues that, in assessing damages with respect to plaintiff's breach of contract claim, the jury failed to take into account a $3,000.00 advance payment AFM made to plaintiff on November 13, 1986. This failure, AFM alleges, "is illustrative of the bias, passion and prejudice reflected by the jury verdict." The court again disagrees. As noted by plaintiff in her response, Instruction No. 21 specifically told the jury what deductions they were to make from any damages they awarded plaintiff on her breach of contract claim. This instruction did not, however, mention the $3,000.00 advance payment to AFM.[14] The court agrees with plaintiff that any failure on the part of the jury to deduct this amount from the breach of contract damage award was simple oversight. Moreover, the court, pursuant to the agreement of plaintiff and AFM, has already deducted $3,000.00 from the judgment to reflect this advance payment. *See Weathers,* 777 F.Supp. 879.

■ AFM claims that plaintiff failed to present any evidence which would support the $55,000.00 "loss of use" award the jury assessed with respect to plaintiff's breach of contract claim. Again, the court disagrees. As noted by plaintiff, the jury was required to deduct the $55,428.00 mortgage pay-off from the amount it awarded plaintiff for the loss of the dwelling. The effect of this deduction is that plaintiff has been required to pay for two residences since the date of the fire: (1) the old home which was destroyed by fire; and (2) other inhabitable living quarters.[15] In light of this

---

13. In the verdict form, the jury was asked: "Do you find from a preponderance of the evidence that the fire in question was incendiary in origin; that is, that the fire did not occur through accident or negligence, but was deliberately and intentionally set by some person with the intent

to cause destruction of the insured property?" The jury responded "NO".

14. AFM did not request that the Instruction No. 21 refer to the $3,000.00 advance payment.

15. During cross-examination, AFM employee Dennis Atkins testified that plaintiff moved into

fact, the court finds that the jury award for "loss of use" is sufficiently supported by the record.[16] In passing, the court notes that it is absurd to believe that an insured can survive without a home and personal effects for five years without incurring "additional living expenses" as they are defined in plaintiff's insurance policy with AFM.[17]

■ The final individual award challenged by AFM is the $100,000.00 awarded by the jury, pursuant to plaintiff's malicious prosecution claim, for loss of net business income. AFM contends that this amount is unsupported by the evidence. In response, plaintiff acknowledges that the amount awarded is not wholly supported by the evidence. Accordingly, plaintiff proposes that the court grant a remittitur to reflect a net business loss of $35,419.00. After reviewing the evidence introduced by plaintiff concerning her business' profits and losses, the court will grant a remittitur as proposed by the plaintiff. See 11 C. Wright & A. Miller, *Federal Practice and Procedure* § 2815, at 100–103 (1973). The court finds that the amount proposed by the plaintiff, $35,419.00, is adequately supported by the record.

■ Finally, AFM asserts that the verdict, in its entirety, is "excessive." Reviewing the verdict as a whole, the court rejects AFM's assertion. The amounts awarded by the jury are unquestionably large. However, the misconduct on the part of AFM was severe, as were the consequences. As a result of AFM's misconduct, a once active, outgoing, and productive woman has been put through enormous emotional and financial strain. According to her treating psychologist, Dr. William Albott, plaintiff continues to suffer emotionally as a result of AFM's misconduct.[18] Plaintiff's once-thriving photogra-

phy business has been seriously, if not permanently, damaged. Likewise, plaintiff's reputation in the community in which she lives appears to have been irreparably damaged. Finally, plaintiff has been without her home and belongings for over five years. In short, plaintiff's life has been indelibly and tragically changed. In light of these factors, and in light of the seriousness of AFM's misconduct, the court's conscience is in no way shocked by the verdict, nor does the court believe that the verdict was the result of passion, prejudice or bias. *See Southwest Forest Indus., Inc. v. Sutton*, 868 F.2d 352, 356–57 (10th Cir.1989), *cert. denied*, 494 U.S. 1017, 110 S.Ct. 1320, 108 L.Ed.2d 496 (1990).

### 3. References to the terms "arson" and "arsonist"; evidence of plaintiff's acquittal.

■ Although AFM acknowledges that malicious prosecution was an issue in the case, it argues that the court should have required all attorneys and witnesses to use the terms "set fire" or "incendiary fire," rather than "arson" and "arsonist." Further, AFM argues that the court should have given a "cautionary" instruction telling the jury that they were not to be influenced by the outcome of the criminal proceedings in deciding whether the fire at plaintiff's home was a "set fire." For the reasons set forth below, the court rejects both of these arguments.

The first argument, that the court should have prohibited references to the terms "arson" and "arsonist," borders on the nonsensical. Clearly, one of the central issues in plaintiff's case against AFM was whether AFM caused the institution of the criminal arson charges against plaintiff. To have required attorneys and witnesses to refer to "arson" as "set fire" or "incendiary" would have been difficult if not im-

---

the Clubhouse Inn in Topeka after the fire. Atkins further testified that AFM refused to pay for this expense.

**16.** The jury was clearly aware that plaintiff's old home was uninhabitable.

**17.** The policy defines "additional living expense" as "any necessary increase in living expenses

incurred by [the insured] so that [the insured's] household can maintain its normal standard of living."

**18.** Although controverted by AFM's expert witness, plaintiff's treating psychiatrist, Dr. Eaton, testified that plaintiff suffers from post-traumatic stress disorder.

possible.[19] AFM apparently assumes that the jury was not intelligent enough to have known that "set fire" and "incendiary fire" were synonymous with "arson." Although AFM contends that it was prejudiced by the repeated references to "arson" and "arsonist," the court finds that AFM was prejudiced only by its own misconduct.

▮ As for AFM's second argument, the court recognizes the generally accepted rule that evidence of an insured's acquittal on criminal arson charges is not admissible in a subsequent civil action brought by the insured to recover fire insurance proceeds. *See Rabon v. Great Southwest Fire Ins. Co.*, 818 F.2d 306, 309 (4th Cir.1987); *Kelly's Auto Parts, No. 1, Inc. v. Boughton*, 809 F.2d 1247, 1253 (6th Cir.1987); *American Home Assurance Co. v. Sunshine Supermarket, Inc.*, 753 F.2d 321, 325 (3d Cir.1985). However, the court finds that the instant case presented a narrow exception to this general rule because plaintiff filed malicious prosecution and outrage claims in addition to the breach of contract claim, and AFM failed to request a severance of the contract and tort claims. *See Wheat v. Continental Casualty Co.*, 652 S.W.2d 345, 346–47 (Tenn.1983). In light of the existence and viability of the malicious prosecution claim, the evidence of plaintiff's acquittal was clearly admissible. Thus, the question is whether the jury was appropriately instructed and aware of their duty to make an independent determination as to the cause of the fire, notwithstanding the evidence of plaintiff's acquittal. Reviewing the jury instructions in their entirety, the court believes that the jury was properly informed of their duty to independently decide whether the fire was "incen-

diary in origin." [20] *See Street*, 929 F.2d at 539. Accordingly, the court finds that AFM was not prejudiced by the court's refusal to accept its proposed "cautionary" instruction.[21] *See Northbrook Excess and Surplus Ins. Co. v. Procter & Gamble Co.*, 924 F.2d 633, 638 (7th Cir.1991); *see also Mitchell v. Keith*, 752 F.2d 385, 388 (9th Cir.1985) (holding that there is no error in refusing to give incorrect or misleading instructions), *cert. denied*, 472 U.S. 1028, 105 S.Ct. 3502, 87 L.Ed.2d 633 (1985).

*4. Independent contractor instruction.*

▮ AFM contends that the court erred in denying its request to include an "independent contractor" instruction in conjunction with Instruction No. 4, which advised the jury, in part, that "[t]he conduct of an officer, agent, or employee acting within the scope of his employment is the conduct of the [defendant] corporation." In support of its contention, AFM argues that the jury may have concluded that the investigations or opinions of AFM's independent expert witnesses were reckless and thus the jury may have based their outrage finding on the conduct of these witnesses, who, AFM alleges, were "independent contractors."

The court finds no merit to AFM's argument. The court first notes that AFM has cited no cases, and the court has found none, which support AFM's argument that a party is entitled to an instruction informing the jury of the relationship between the party and his or her expert witnesses. Moreover, as plaintiff points out in her response, AFM supplied the majority of its expert witnesses for use at plaintiff's criminal trial and has continued to rely on these

19. AFM cites no cases in support of this argument and the court has found none.

20. In Instruction No. 8, the court instructed the jury on burden of proof. In Instruction No. 10, the court instructed the jury that defendant AFM was required to prove, by a preponderance of the evidence, that: (1) the fire was incendiary in origin; and (2) that the plaintiff was the person who intentionally and willfully set the fire, or solicited, procured, aided or counseled some other person to do so for her. On the verdict form, Questions 1, 2a, 2b and 2c specifically informed the jury of their responsibility to

independently determine the cause of the fire. For example, in Question 1, the jury was asked: "Do you find from a preponderance of the evidence that the fire in question was incendiary in origin; that is, that the fire did not occur through accident or negligence, but was deliberately and intentionally set by some person with the intent to cause destruction of the insured property?"

21. The proposed instruction submitted by AFM discussed the evidence of acquittal but was rejected because it was not narrowly tailored to the breach of contract claim.

same witnesses throughout the course of the instant litigation. Accordingly, AFM cannot now "disassociate" itself from the opinions which it willingly chose to rely upon. Finally, the court finds no basis in the record to support AFM's contention that the jury's finding with respect to plaintiff's outrage claim was based on the conduct of AFM's expert witnesses. Rather, the overwhelming weight of the evidence demonstrates that it was AFM's conduct which was outrageous.

### 5. *Instructions re: AFM's defenses to plaintiff's breach of contract claim.*

AFM argues that the court erred in giving Instructions 9 through 11 (concerning AFM's defenses to plaintiff's breach of contract claim) without informing the jury that AFM claimed that "an insured" intentionally burned or procured the burning of the property and breached the cooperation clause. In support of this argument, AFM contends that the insurance policy provided

for exclusion of coverage if *any* insured violated the terms of the policy. At trial, AFM contends, evidence was introduced indicating that plaintiff's son, Brady Weathers, intentionally set the fire and concealed information during his examination under oath.

As noted by the plaintiff in her response, much of AFM's argument is moot because the jury specifically determined that the fire was *not* incendiary in origin. Thus, it is irrelevant whether the jury was informed that Brady's setting of the fire would result in a denial of coverage.[22]

▬▬▬▬ In passing, the court notes that even if the jury had concluded that Brady was involved in setting the fire, this would not necessarily have resulted in a denial of coverage to the plaintiff. At trial, the court held that plaintiff could recover under the policy if she was determined to be an innocent coinsured. Upon review, the court affirms this ruling.[23]

---

**22.** Although the jury was not informed that Brady's involvement in the fire would result in a denial of coverage, they were asked, in Question 2b of the verdict form, whether Brady intentionally and willfully set fire to the insured property. The jury never reached this question because they determined that the fire was not intentionally set.

**23.** The modern approach in determining whether an innocent coinsured may recover under a policy of insurance, often referred to as the "best reasoned rule", requires a court to contractually analyze the provisions of the applicable insurance policy. *Vance v. Pekin Ins. Co.,* 457 N.W.2d 589, 592 (Iowa 1990) (discussing the three theories of recovery and adopting the "best reasoned rule"). If the policy language is ambiguous, such language is construed against the insurer. *Id.* Although the Kansas courts have not had an opportunity in recent years to rule on the matter, the court believes that the Kansas courts would adopt the "best reasoned rule". *See Millers Nat. Ins. Co. v. Bunds,* 158 Kan. 662, 149 P.2d 350 (1944) (holding that where the interests of coinsureds are regarded as divisible or separable, an innocent coinsured is not precluded from recovering on a fire insurance policy even though one of the other coinsureds intentionally burned the covered property).

Reviewing plaintiff's insurance policy with AFM, the court finds the policy ambiguous as to the effect of Brady's alleged actions and their effect on the plaintiff. Although Brady is clearly an "insured", the fact that he may have inten-

tionally set the fire does not automatically void the policy. To the contrary, the intentional setting of the fire, by itself, is not an act of concealment, misrepresentation, fraud, or false swearing. Unlike other cases in which guilty insureds have set the fire and attempted to receive insurance proceeds for the loss, *see, e.g., Sales v. State Farm Fire and Casualty Co.,* 849 F.2d 1383, 1386 (11th Cir.1988) (denying recovery, under similar policy provisions, where husband intentionally set fire and then filed a claim for insurance proceeds), Brady had no interest in the property (other than his own personal belongings) and was not involved in submitting the loss claims to AFM. Accordingly, the court finds, as a matter of law, that the policy would not have been voided if Brady set the fire without the knowledge of the plaintiff.

As further support for this conclusion, the court notes that all courts dealing with this issue, regardless of their legal theories or ultimate conclusions, have consistently noted the competing policies of preventing a wrongdoer from benefitting from his wrongdoing and preventing the imposition of wrongdoing on an innocent party. *See, e.g., Vance,* 457 N.W.2d at 590; *Error v. Western Home Ins. Co.,* 762 P.2d 1077, 1081 (Utah 1988). Although preventing enrichment to a wrongdoer may normally be the dominant consideration, *see Norman v. State Farm Fire & Cas. Co.,* 804 F.2d 1365, 1366 (5th Cir.1986), such a factor holds little weight in a case such as this where the alleged wrongdoer holds little or no interest in the insured property. Accordingly, the court believes that the policy of preventing the imposition of

As for AFM's argument concerning the alleged breach of the cooperation clause by Brady, the court finds no error in the instructions because there was simply no evidence from which reasonable jurors could have concluded that Brady breached any of the provisions of the policy. At most, Brady refused, pursuant to the instructions of his mother's attorney, to divulge the specific opinions of plaintiff's expert witness concerning the television's involvement in the fire.[24] There is simply no evidence that such refusal was made with an intent to defraud AFM. More importantly, there is no evidence indicating that such refusal resulted in substantial prejudice to AFM. As discussed below in Section 10, it is clear that plaintiff's theory of the fire was, and still is, irrelevant to AFM.

### 6. *Insurer's need to notify as to all grounds for denial.*

AFM argues that the court erred in refusing to give the following proferred instruction:

> Under the laws of the State of Kansas, where an insurer has two or more grounds on which to avoid liability, a notice given the insured as to the grounds for denying or avoiding liability must embrace all such grounds, under a penalty of the insurer being deemed to have waived any ground not specified.

AFM alleges that it "is aware of the apparent impact made by defendant's lengthy and detailed denial letters" and argues that the proferred instruction "would have avoided the prejudicial effect of the letters."

The court finds no prejudice to AFM because the proferred instruction was rejected. First, AFM's witnesses were allowed to testify about their obligation to list all reasons for denial and AFM's counsel was able to argue this point during closing arguments. Second, reviewing the instructions as a whole, the court believes that the jury was properly guided in its deliberations, particularly with respect to plaintiff's outrage claim.[25] *See Street,* 929 F.2d at 539. Finally, and most importantly, although AFM repeatedly asserts that it was "statutorily required to list each and every defense it had or waive that defense," it is clear that an insurer is not statutorily required to assert frivolous reasons for denial or couch the reasons for denial in an inflammatory denial letter. At trial, Dennis Atkins, the AFM employee responsible for preparing the denial letters, reviewed in detail the numerous reasons for denial listed in each of the three denial letters (Exhibits 613, 614 and 615). Atkins then testified that all but one of the listed reasons were irrelevant—specifically, Atkins testified that AFM probably would not have denied plaintiff's claim if AFM had not taken the position that the fire was incendiary in origin. Further, on cross-examination, Atkins was unable to substantiate many of the reasons for denial listed in the letters and even admitted that at least one of the reasons was erroneous. Aside from this damaging testimony, a simple review of the denial letters demonstrates that they were poorly written and inflammatory. As noted by the plaintiff in her response, "each alleged failure by plaintiff is listed multiple times, one for each separate policy condition violated, rather than given once along with all the various policy conditions that relate to that act or omission," thus making the letters "longer, wordier, and presumably more intimidating . . . ."

### 7. *Burden of proof on tort claims.*

AFM attacks the court's instructions concerning plaintiff's burden of proof with respect to her tort claims. Specifically, AFM contends that Instructions 15, 22 and 24 were erroneous because they informed the jury that plaintiff's burden of proof was "a

wrongdoing on an innocent coinsured is the dominant and controlling factor in the instant case.

**24.** As discussed below in Section 10, the court finds that such refusal was justified by Brady's exercise of his Fifth Amendment rights.

**25.** Clearly, the denial letters could only have had an impact on the jury's finding with respect to plaintiff's outrage claim.

preponderance of the evidence" rather than "clear and convincing evidence." In support of this contention, AFM cites an unpublished opinion of the Kansas Court of Appeals, *Mitchell v. Thorman and Wright Motel Corp.*, 807 P.2d 161 (Kan.Ct.App. 1991). Therein, the court suggested that, by seeking punitive damages, a plaintiff voluntarily undertakes to prove her underlying claims by clear and convincing evidence.

 The court finds no merit to AFM's argument. The *Mitchell* opinion cited by AFM is an aberration and a misstatement of the law. Moreover, the opinion clearly indicates that it has no precedential value.[26] Accordingly, the court finds that the jury was properly instructed with respect to plaintiff's burden of proof on her tort claims. Further, the court finds that the jury was properly instructed as to plaintiff's differing burdens of proof with respect to her claims for punitive damages.

8. *Court's denial of AFM's motions for partial summary judgment and for directed verdict on plaintiff's outrage claim.*

AFM argues that the court should have granted its motion for partial summary judgment or, at a minimum, granted its motion for directed verdict with respect to plaintiff's outrage claim. In support of this argument, AFM contends that plaintiff failed to the meet the threshold requirements for establishing an outrage claim.

 In *Roberts v. Saylor*, 230 Kan. 289, 637 P.2d 1175 (1981), the Kansas Supreme Court held that a trial court must make two threshold determinations regarding a tort of outrage claim before the claim is submitted to the jury. First, the court must determine whether "the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery." *Id.* at 292, 637 P.2d 1175. Second, the court must determine whether "the emotional distress suffered by plaintiff is in such extreme degree the law must intervene because the distress inflicted is so severe that no reasonable person should be expected to endure it." *Id.* at 292–93, 637 P.2d 1175.

In the instant case, the court determined, at the time of trial, that the plaintiff had presented sufficient evidence to satisfy both of the requirements set forth in *Roberts*. For the reasons set forth below, the court affirms those findings upon review of the record.

The first threshold requirement, that of extreme and outrageous conduct, was succinctly explained in *Roberts:*

It should be understood that liability does not arise from mere insults, indignities, threats, annoyances, petty expressions, or other trivialities. Members of the public are necessarily expected and required to be hardened to a certain amount of criticism, rough language and to occasional acts and words that are definitely inconsiderate and unkind. The law should not intervene where someone's feelings merely are hurt. Freedom remains to express an unflattering opinion and to blow off relatively harmless steam which comes from an uncontrollable temper. Conduct to be a sufficient basis for an action to recover for emotional distress must be outrageous to the point that it goes beyond the bounds of decency and is utterly intolerable in a civilized society.

*Id.* at 293, 637 P.2d 1175.

Here, the court finds that AFM's conduct went far beyond mere indignities, threats and trivialities. Although the case at first glance might appear to be nothing more than a bad faith denial of an insurance claim, a closer look at the evidence reveals otherwise.[27] Viewing the evidence in the

---

**26.** As noted by plaintiff in her response, AFM's reliance on Mitchell is a violation of Kansas Supreme Court Rule 7.04 which provides that unpublished opinions are not to be cited as precedent by any court or in any brief or other material presented to any court, except to support a claim of res judicata, collateral estoppel, or law of the case.

**27.** In denying AFM's motion for partial summary judgment with respect to plaintiff's outrage claim, the court itself expressed doubts

light most favorable to the plaintiff, the court finds that defendant AFM engaged in a lengthy course of wanton, wilful and malicious conduct. Without specifically describing each wrongful act, the court notes that the course of misconduct began on November 13, 1986, when AFM investigator Steve Thompson arrived on the fire scene and announced to Steve Kreuger, the local AFM representative and plaintiff's boyfriend, that his job was "to put people in jail." Thereafter, Thompson manipulated evidence and expert witnesses in an effort to demonstrate that plaintiff intentionally set the fire at her house. Further, Thompson ignored exculpatory evidence and exculpatory expert opinions. Aside from this seriously-flawed fire investigation, plaintiff was given little or no guidance by AFM in processing her insurance claim. In May of 1987, AFM rejected plaintiff's request that her home be rebuilt with the proceeds from the homeowner's insurance policy. Although AFM's primary reason for denial was its contention that plaintiff was involved in intentionally setting the fire at her home, AFM "manufactured" numerous other reasons for denying plaintiff's claim and included those frivolous reasons in inflammatory denial letters. After denying plaintiff's insurance claim, AFM, without probable cause and with malice, caused the institution of criminal arson charges against the plaintiff. In so doing, AFM told the Shawnee County District Attorney that it would pay for the expert witnesses at plaintiff's criminal trial. Even after plaintiff was acquitted, AFM continued to assert that the fire was intentionally set and that plaintiff had been involved therein. Moreover, AFM continued to deny plaintiff benefits under her insurance policy. Although AFM alleges that "[p]laintiff's case is devoid of so much as a shred of evidence against this Defendant that would comport with the requirements and essence of a claim sounding in the tort of outrage," the court finds otherwise. In short, the court finds that reasonable persons could regard AFM's behavior under the circumstances as "utterly intolerable in a civilized society." *Taiwo*, 822 P.2d at 1030.

The court now turns to the second threshold requirement. In *Roberts*, the Kansas Supreme Court discussed the requirement of extreme and severe emotional distress:

> Emotional distress passes under various names such as mental suffering, mental anguish, nervous shock, and includes all highly unpleasant mental reactions, such as fright, horror, grief, shame, embarrassment, anger, chagrin, disappointment, and worry. However, it is only when emotional distress is extreme that possible liability arises.
>
> The extreme distress required must be reasonable and justified under the circumstances, and there can be no liability where the plaintiff has appeared to suffer exaggerated and unreasonable emotional distress, unless it results from a peculiar susceptibility to such distress of which the actor had knowledge. (Citations omitted.) The emotional distress must in fact exist, and it must be severe. (Citation omitted.)

230 Kan. at 294, 637 P.2d 1175.

Here, it is clear that plaintiff presented enough evidence to allow reasonable jurors to conclude that she suffered extreme and severe emotional distress. The record is replete with testimony from various witnesses detailing the extreme emotional distress and accompanying physical problems suffered by the plaintiff as a result of AFM's misconduct. For example, both plaintiff's psychiatrist and psychologist testified about the extreme emotional suffering the plaintiff endured and continues to endure. Likewise, plaintiff herself testified in detail about the fear, anxiety, anger and embarrassment she suffered as a result of AFM's conduct. In addition to this evidence, the court finds that "the enormity of the outrage created by [AFM's] conduct is sufficient to satisfy the second threshold requirement...." *Taiwo*, 822 P.2d at 1031.

about the sufficiency of plaintiff's evidence on this claim. Those doubts were erased at trial.

AFM has also asserted several miscellaneous arguments concerning plaintiff's outrage claim which the court will briefly review.[28] First, AFM argues that its compliance with the Kansas arson reporting-immunity act ("KARIA") cannot render it liable to plaintiff under a claim of outrage. As the court noted in denying AFM's motion for partial summary judgment on this issue, although the KARIA provides immunity to an insurance company which has disclosed information to a state agency, its provisions do not apply in cases where an insurance company or any person acting on its behalf has displayed gross negligence, bad faith, malice, or fraud. *See* K.S.A. 31–402(e). Here, the evidence introduced at trial overwhelmingly indicated that AFM acted maliciously and in bad faith. Accordingly, AFM's claim of immunity is rejected.

AFM next argues that it had no duty to disclose exculpatory evidence to plaintiff. Whether or not AFM had a duty to disclose such information to the plaintiff, the record, viewed in the light most favorable to the plaintiff, indicates that AFM withheld such information when directly asked by the prosecuting authorities if there was any reason why plaintiff should not be prosecuted for aggravated arson. Such withholding of information could have been properly considered by the jury as one of many outrageous acts on the part of AFM.

Similarly, AFM attempts to downplay the role it played in plaintiff's prosecution by arguing that Gene Olander, the Shawnee County District Attorney, made the ultimate decision to prosecute. As the jury's findings with respect to plaintiff's malicious prosecution claim indicate, the evidence revealed otherwise. As the court has previously noted, AFM withheld critical information from Olander, while simulta-

neously offering to pay for the cost of expert witnesses.[29] Such conduct, the court finds, could be considered outrageous by reasonable jurors.

AFM further argues that plaintiff failed to prove proximate causation between AFM's conduct and plaintiff's emotional distress. The court finds this argument bordering on the frivolous. The evidence, viewed in the light most favorable to the plaintiff, clearly indicates that plaintiff's emotional suffering and accompanying physical ailments were a direct result of AFM's misconduct. Further, the jury, after being appropriately instructed, reached the same conclusion and awarded plaintiff a substantial amount for her injuries. AFM's argument is therefore rejected.

Finally, AFM argues that its investigation and denial of plaintiff's claim cannot constitute the basis for an outrage claim.[30] In support of its argument, AFM cites *Spencer v. Aetna Life & Casualty Co.*, 227 Kan. 914, 611 P.2d 149 (1980). Therein, the Kansas Supreme Court held that Kansas law does not recognize the tort of bad faith against insurers. *Id.* at 926, 611 P.2d 149. In reaching its conclusion, the court specifically noted that state laws regulating insurance companies adequately protect policy-holders from abusive tactics by insurers. *Id.* at 916, 611 P.2d 149. Accordingly, the court saw no reason to recognize a new cause of action in situations where an insurer fails to act in good faith in paying a claim. *Id.*

Notably, however, *Spencer* does not prohibit claims of outrage. In *Osgood v. State Farm Mut. Auto. Ins. Co.*, 848 F.2d 141 (10th Cir.1988), the Tenth Circuit Court of Appeals held that "[t]he failure to recognize the tort of bad faith ... does not bar

---

**28.** The court notes that some of these arguments are more properly directed towards plaintiff's malicious prosecution claim. Nonetheless, the court will discuss them in connection with AFM's attack on the outrage claim.

**29.** Although AFM denies making such an offer, the evidence, viewed in the light most favorable to the plaintiff, indicates otherwise.

**30.** Although this argument is contained in the section of AFM's motion discussing punitive damages, the court finds it more appropriate to review this argument in connection with AFM's other attacks on the outrage claim.

an insured from bringing other types of tort actions against his insurer." *Id.* at 144. As noted by the *Osgood* court, this conclusion is exemplified by *State Farm Fire & Cas. Co. v. Liggett*, 236 Kan. 120, 122–23, 689 P.2d 1187 (1984), in which the plaintiffs were permitted to bring an action for the tort of outrage when their insurer refused to pay a claim. *Id.* AFM's argument is therefore rejected.

9. *Court's denial of AFM's motions for partial summary judgment and for directed verdict on plaintiff's malicious prosecution claim.*

AFM argues that the court should have granted its motion for partial summary judgment or, alternatively, its motion for directed verdict with respect to plaintiff's malicious prosecution claim. In support of this argument, AFM contends that plaintiff failed to produce sufficient evidence that: (1) AFM initiated criminal proceedings against the plaintiff; (2) AFM acted without probable cause; and (3) AFM acted against plaintiff for a wrong or improper motive.

▆▆▆ The majority of AFM's arguments were asserted in its challenge to plaintiff's outrage claim and have already been discussed by the court. Suffice it to say that the evidence, viewed in the light most favorable to the plaintiff, was clearly sufficient to satisfy each of the elements of a claim of malicious prosecution. *See Nelson v. Miller*, 227 Kan. 271, 276–78, 607 P.2d 438 (1980). Moreover, the evidence was sufficient to demonstrate that AFM did not fully and truthfully disclose all pertinent facts to the prosecuting attorney, thereby negating AFM's defense to the malicious prosecution claim. *Id.* at 279–80, 607 P.2d 438.

In passing, the court finds it necessary to briefly comment on several of AFM's contentions. First, the court notes that the fact that AFM had a duty to turn over information to the authorities pursuant to the KIRIA does not mean that the information actually turned over was truthful or correct. Second, because the evidence demonstrated that it acted with malice, AFM is not entitled to the immunity provid-ed by the KIRIA. Finally, the fact that a preliminary hearing was conducted is not determinative of the issue of probable cause. *See Thompson v. General Finance Co.*, 205 Kan. 76, 94–95, 468 P.2d 269 (1970).

10. *Court's denial of AFM's motion for directed verdict on plaintiff's breach of contract claim.*

AFM contends that the court erred in refusing to direct a verdict in its favor on plaintiff's breach of contract claim. In support of this contention, AFM raises several arguments. First, AFM argues that plaintiff violated the concealment and cooperation clauses of the insurance policy because she "withheld information as to the cause of the fire" pursuant to an improperly asserted Fifth Amendment privilege. Second, AFM argues that plaintiff breached several provisions of the contract when her attorney refused to let one of AFM's expert witnesses conduct a scene investigation until after plaintiff's retained expert had conducted his own investigation of the fire. Third, AFM argues that plaintiff breached the contract because she made claim for more than her insurable interest in the property. The court will review each of these arguments in order.

The evidence, viewed in the light most favorable to the plaintiff, reveals the following facts. At the time of the examinations under oath of plaintiff and her son, the KARIA had been invoked and AFM and the state fire marshal's office were exchanging information concerning the fire. Further, there were strong indications that plaintiff and her son were criminal suspects. Thus, in submitting to examinations under oath, plaintiff and her son were faced with a serious dilemma: answer all questions posed by AFM and risk compromising their defense to criminal arson charges by having such information turned over to the state fire marshal's office *or* refuse to answer certain of AFM's questions and risk violating one or more provisions of the insurance policy. Pursuant to the advice of their attorney, plaintiff and her son chose the latter option. During their examinations under oath, plaintiff and

her son, when asked about the cause of the fire, testified that it was accidental. However, both plaintiff and her son refused to answer specific questions regarding information and conclusions developed by plaintiff's retained expert witness, Pat McGinley, as to his findings regarding his cause and origin investigation.[31]

At the time of trial, the court considered the question of whether plaintiff and her son had properly invoked their Fifth Amendment privileges in refusing to answer certain of AFM's questions. In light of the fact that the KARIA had been invoked at the time of the examinations and AFM was under a statutory obligation to forward any information it received to the state fire marshal's office, the court concluded that, in conducting the examinations, AFM was acting as an agent of the state. Thus, the court concluded, plaintiff's and her son's Fifth Amendment rights were implicated. Accordingly, in Instruction No. 12, the court informed the jury of plaintiff's rights:

## INSTRUCTION NO. 12

In considering the defense of plaintiff's alleged lack of cooperation, you should take into consideration plaintiff's constitutional rights at the time in question. Pursuant to the Fifth Amendment of the United States Constitution, once plaintiff became a suspect in a criminal prosecution, she had a right to refuse to make any disclosures which she reasonably apprehended could have been used in a criminal prosecution against her, or which could have led to other evidence that might have been so used. To the extent that this constitutional right conflicted with any provision in the insurance policy, you are instructed that the constitutional right had precedence and plaintiff cannot be held to have breached a specific provision of the insurance poli-

cy if, by doing so, she was exercising her Fifth Amendment constitutional right.

■ AFM now objects to the court's findings and contends that plaintiff and her son did not have a right to exercise their Fifth Amendment rights during their examinations under oath. In support of its position, AFM relies on several cases from other jurisdictions that have held that an insured cannot invoke his or her Fifth Amendment rights in an examination under oath because the compulsion to testify arose solely from the terms of a private contract. However, the cases cited by AFM are factually distinguishable from the case at bar. Specifically, none of the cases relied upon by AFM involved a situation where the insurer was conducting itself pursuant to an arson reporting immunity act, as was AFM in this case.[32] More importantly, none of the cited cases discuss the effect of an arson reporting immunity act upon an insured's duty to submit to an examination under oath. *See, e.g., Pervis v. State Farm Fire and Casualty Co.*, 901 F.2d 944 (11th Cir.1990), *cert. denied,* — U.S. ——, 111 S.Ct. 255, 112 L.Ed.2d 213 (1990). In the instant case, the court has no doubt that any information revealed to AFM during the examinations under oath would have in turn been given to the state for later use against plaintiff at her criminal trial. For AFM to assert that plaintiff's or her son's Fifth Amendment rights were not operable at their examinations under oath is absurd. If AFM's argument had merit, then an insured in the plaintiff's position would have to choose between possibly breaching her insurance contract and forfeiting her benefits thereunder or revealing critical information to state authorities which could be used against her in a criminal prosecution. Such a position is simply unacceptable and offensive to constitutional sensibilities.

The court finds it necessary to stress one other critical feature of the case at hand.

---

**31.** In short, plaintiff and her son refused to tell AFM that McGinley believed that the television was the cause of the fire.

**32.** Although AFM correctly notes that arson reporting legislation exists in some of the jurisdic-

tions in which the cited cases arose, there is no indication that such acts had actually been invoked at the time of the examinations under oath in those cases.

Although AFM complains that the court's ruling allows insureds to "deliberately hide material facts," the only information withheld by plaintiff and her son in this case was the opinion of their own hired expert concerning the cause and origin of the fire. Clearly, an insured is under no obligation to independently determine the cause of a fire and report the results to her insurer. Accordingly, the court finds no prejudice to AFM, or other insurers, in allowing an insured to withhold results of an investigation independently conducted by the insured's experts.

■ Even assuming, for the sake of argument, that plaintiff and her son did not have a right to exercise their Fifth Amendment rights at their examination under oath, the court finds no evidence to indicate that the withholding of information constituted a breach of any of the policy provisions. Specifically, the refusal to answer questions would not have violated the concealment clause because there was no evidence from which reasonable jurors could have concluded that plaintiff or her son acted "willfully with intent to defraud." [33] Likewise, the refusal would not have violated the cooperation clause because plaintiff and her son substantially cooperated by submitting to the examinations under oath and stating that the cause of the fire was accidental.[34] *See* Appleman, *Insurance Law and Practice*, § 4773 (1987).

■ More importantly, even assuming that plaintiff and her son did not have a right to exercise their Fifth Amendment rights *and* that their withholding of the requested information constituted a breach of one of the policy provisions, there was simply no evidence introduced at trial from which the jury could have concluded that AFM was prejudiced in any manner by the alleged withholdings. Since the time of plaintiff's criminal trial and throughout the

instant proceedings, AFM has repeatedly heard McGinley's theory of how the fire began and, to date, has rejected it. Accordingly, it is simply not credible for AFM to now suggest that it was prejudiced by not learning about this theory during plaintiff's examination under oath.

Finally, the court notes that the entire issue of this alleged breach of contract by the plaintiff or her son appears to have been created solely for purposes of trial. During cross-examination by plaintiff's counsel, Dennis Atkins, the AFM employee responsible for reviewing plaintiff's claim, testified that he did not object to plaintiff's failure to state her belief that the television caused the fire. Rather, he testified, he considered it a breach of the contract for plaintiff to have claimed the fire was accidental as opposed to incendiary. Accordingly, it is clear that the person responsible for denying plaintiff's claim did not consider it a breach for plaintiff and her son to have withheld the opinions of McGinley.

■ The court now turns to AFM's argument that plaintiff breached several provisions of the insurance policy when, through her attorney, she refused to let one of AFM's expert witnesses conduct a scene investigation until after McGinley had conducted his own investigation of the fire. Viewing the evidence in the light most favorable to the plaintiff, the court finds that plaintiff allowed Dr. Lloyd Brown, AFM's expert, to conduct an investigation within a reasonable amount of time after the fire. Further, the court finds that the television set was at the fire scene during Brown's investigation. Finally, the court finds absolutely no evidence from which a jury could conclude that AFM suffered any prejudice as a result of plaintiff's actions. Accordingly, the court rejects this argument.

33. The concealment clause referred to by AFM is contained in paragraph 2 of the General Conditions section of the insurance policy (page 17) and states:
 Concealment or Fraud. This entire policy is void if, before or after a loss, any insured has willfully with intent to defraud, concealed or misrepresented:

 a. any material fact or circumstance concerning this insurance; or
 b. any insured's interest herein.

34. The cooperation clause of the policy reads as follows: You must cooperate with us in performing all acts required by this policy.

■ Finally, the court finds no merit to AFM's assertion that plaintiff breached the policy by making claim for more than her insurable interest in the property. Plaintiff and her ex-husband, Wesley Weathers, were cotenants of the property (tenancy in common). As a cotenant, plaintiff had the right to simply insure her own interest in the property, or to insure the whole property for the benefit of herself and her husband. *See* 43 Am.Jur.2d *Insurance* § 945. Further, plaintiff's divorce decree required her to maintain insurance on the property. The court therefore finds that plaintiff had an interest in her ex-husband's portion of the property in a representative or fiduciary capacity, thereby giving plaintiff an insurable interest in all of the property. *See id.* at § 946; *see also Big John, B.V. v. Indian Head Grain Co.*, 718 F.2d 143 (5th Cir.1983). Finally, the court finds that AFM will suffer no harm as a result of the court's findings on this issue. On October 18, 1991, the court issued a memorandum and order which, in part, apportioned the loss of dwelling award between plaintiff and her ex-husband. *See Weathers*, 777 F.Supp. 879.

### 11. *Actual damages for emotional distress.*

AFM contends that the actual damages awarded by the jury for emotional distress pursuant to both the outrage and malicious prosecution claims should be reduced to a total of $250,000.00 pursuant to K.S.A. 60–19a01.

The court previously rejected an identical attack made by AFM on the actual damages awarded pursuant to plaintiff's malicious prosecution claim, *id.*, and finds no reason to depart from those findings. Accordingly, the court will simply quote from relevant portions of the court's previous order:

Although there is little case law construing section 60–19a01, the Kansas Supreme Court has discussed the history of the statute in passing on its constitutionality. In *Samsel v. Wheeler Transport Services*, 246 Kan. 336, 789 P.2d 541 (1990), the court was asked to determine whether section 60–19a01 was violative of sections 5 and 18 of the Kansas Bill of Rights. The court reviewed the history of the liability insurance and tort systems that led to the enactment of section 60–19a01. *Samsel*, 246 Kan. at 338–40 [789 P.2d 541]. Specifically, the court noted that the malpractice insurance crises in the 1970's and early 1980's resulted in the enactment of various types of tort reform by Kansas and virtually every other state. *Id.* at 339 [789 P.2d 541]. Initially, the Kansas legislature's actions were focused almost exclusively on medical malpractice actions. *Id.* at 339–340 [789 P.2d 541]. This focus was later expanded with the enactment of section 60–19a01, which refers to "personal injury" actions. *Id.* at 346 [789 P.2d 541].

Although the court did not expressly discuss the scope of section 60–19a01 in *Samsel,* the opinion does suggest that the court would limit application of the statute to negligence actions. Throughout the opinion are numerous references to "negligence," "negligent act," "negligent tortfeasor," and "negligence actions." *Id.* at 354, 355, 358, 361, 364, 365, 366, 368, 369 [789 P.2d 541]. These references, read in light of the court's discussion of the history of the statute, lead us to the inevitable conclusion that section 60–19a01 was not intended to apply to cases in which the tortfeasor's actions have gone beyond negligence. Because insurance coverage is simply not available for intentional torts, application of section 60–19a01 in intentional tort cases would do nothing to further the legislature's intention of easing insurance rates and ensuring the continued availability of liability insurance. Similarly, application of section 60–19a01 in such cases would do nothing to speed or ensure recovery by victims of intentional torts. Aside from these factors, the court finds nothing in the language of the statute or in the *Samsel* opinion to indicate that the Kansas legislature intended to deny full recovery to victims of intentional torts. Accordingly, the court concludes that section 60–19a01 is inap-

plicable to plaintiff's malicious prosecution claim.

Even assuming, *arguendo*, that intentional torts are included within the scope of section 60–19a01, the court would conclude that the statute is inapplicable to the instant case. Subsection (b) of the statute refers to damages for "pain and suffering". K.S.A. 60–19a01(b). Although this term is not defined in the statute, the court agrees with plaintiff that the term "refers to the misery associated with physical injury and not to the emotional distress experienced by plaintiff as a result of malicious prosecution." *Id.*

 In passing, the court notes that K.S.A. 60–19a01 is inapplicable to plaintiff's outrage claim because that claim accrued prior to July 1, 1987, the effective date of the statute. *See* 1 Am.Jur.2d *Actions* § 88.

### 12. *Court's failure to itemize outrage verdict.*

AFM argues that the court erred in failing to itemize the outrage verdict to reflect the specific amount awarded by the jury for pain and suffering. In support of its argument, AFM cites K.S.A. 60–19a01(c) which requires itemization of verdicts in personal injury actions.

The court finds no merit to AFM's argument. As noted above, the court concluded at the time of trial that plaintiff's outrage claim accrued prior to July 1, 1987, the effective date of K.S.A. 60–19a01. Upon review, the court affirms that conclusion. *See* 1 Am.Jur.2d *Actions* § 88. Accordingly, the court was under no obligation to itemize the outrage verdict.

### 13. *Court's denial of AFM's motion for directed verdict on the issue of punitive damages.*

AFM maintains that the court erred in denying AFM's motion for directed verdict

on the issue of punitive damages. In support of this argument, AFM contends that: (1) the punitive damage awards are duplicative; (2) plaintiff did not present sufficient evidence for the issue of punitive damages to be submitted to the jury; and (3) the punitive damage awards are violative of AFM's right of due process and are unconstitutional under the standards enunciated by the United States Supreme Court in *Pacific Mutual Life Insurance Co. v. Haslip*, —— U.S. ——, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991).

The court has already discussed, and rejected, AFM's contention that the punitive damage awards pursuant to plaintiff's outrage and malicious prosecution claims are duplicative. Accordingly, the court finds it unnecessary to again review this issue.

 As for AFM's argument that the plaintiff did not present sufficient evidence to allow the issue of punitive damages to be submitted to the jury, the court finds no merit thereto. "The issue of whether there is sufficient evidence to justify punitive damages is a question of law" and the court's review must be "confined to the assessment of whether the plaintiff presented evidence sufficient that a reasonable person might conclude that the defendant acted in a punitive manner." *Mason v. Texaco, Inc.*, 948 F.2d 1546, 1561 (10th Cir.1991). In Sections 8 and 9 of this opinion, the court concluded that the evidence overwhelmingly supported plaintiff's tort claims. Likewise, the court finds that the evidence presented by the plaintiff was more than sufficient to support the jury's findings with respect to the issue of punitive damages.[35] Specifically, the trial was replete with evidence that AFM engaged in a continuing course of malicious and willful conduct. At a minimum, the court finds that the evidence was sufficient to allow reasonable jurors to conclude that AFM acted towards the plaintiff with a realization of the imminence of harm to her and a

---

**35.** The court notes that AFM is incorrect in asserting that, to recover punitive damages with respect to her outrage claim, plaintiff had to prove, by "clear and convincing evidence," that AFM acted "with willful conduct, wanton conduct, fraud or malice." As noted above, plain-

tiff's outrage claim accrued prior to July 1, 1987, and is not subject to the provisions of K.S.A. 60–3701. Accordingly, the jury was instructed under the traditional preponderance of the evidence standard. *See Mason v. Texaco, Inc.*, 741 F.Supp. 1472, 1508–09 (D.Kan.1990).

reckless disregard to the probable consequences of its actions.

The court also finds it necessary to briefly comment on AFM's responsibility for punitive damages. Although AFM repeatedly attempts to argue that it cannot be responsible for punitive damages, the court finds otherwise. Clearly, there is no "smoking gun" document in which AFM expressly ratified each wrongful act. However, the record is replete with evidence indicating AFM's acquiescence and approval of the actions of each of its employees. Moreover, the jury was specifically instructed that punitive damages could not be assessed against AFM for the acts of any agent or employee, unless the questioned conduct was authorized or ratified by AFM. As the verdict clearly reflects, the jury concluded that AFM had authorized or ratified the misconduct. Reviewing the record, the court finds that the jury's conclusions on this issue are supported by the weight of the evidence.

Finally, the court finds no merit to AFM's assertion that the imposition of punitive damages is violative of its due process rights. In *Haslip*, the case cited by AFM in support of its argument, the Supreme Court reviewed an Alabama case in which the defendant insurance company made a similar challenge to an award of punitive damages. Although the Court conceded "that unlimited jury discretion—or unlimited judicial discretion for that matter—in the fixing of punitive damages may invite extreme results that jar one's constitutional sensibilities," the court refused to "draw a mathematical bright line between the constitutionally acceptable and the constitutionally unacceptable that would fit every case." *Haslip*, 111 S.Ct. at 1043. The Court did note, however, "that general concerns of reasonableness and adequate guidance from the court when the case is tried to a jury properly enter into the constitutional calculus." *Id.* In rejecting the defendant's due process challenge, the Court focused on three factors: (1) the jury instructions; (2) post-trial review of the punitive damage award; and (3) procedures for Alabama Supreme Court review of the award. *Id.* at 1044–46.

■ Applying similar factors to the case at hand,[36] the court first turns to the jury instructions. Because of the fact that plaintiff's outrage and malicious prosecution claims accrued at different times, the standards of proof and applicable procedures with respect to the assessment of punitive damages were different. Accordingly, the court was left to fashion a set of instructions that would logically describe these procedures to the jury. After input from counsel,[37] the following instructions were given to the jury:

### INSTRUCTION NO. 24

On her claims of outrage and malicious prosecution, plaintiff has requested, and may be entitled to recover, punitive damages.

Under applicable Kansas law, the jury's role and the standard of proof with respect to punitive damages differs depending upon when the wrongful act in question allegedly occurred. The court has determined, as a matter of law, that you should follow the following procedures in considering plaintiff's requests for punitive damages against defendant American Family:

With respect to plaintiff's request for punitive damages on her outrage claim against American Family, if you determine that plaintiff is entitled to recover actual damages, then in addition to such damages you may award plaintiff an additional amount as punitive damages in such sum as you believe, from a preponderance of the evidence, will serve to punish defendant American Family and to deter others from like conduct.

---

**36.** Obviously, the third factor considered by the Court in *Haslip* is inapplicable here.

**37.** Although AFM objected to the fact that Instruction No. 24 did not set forth a "clear and convincing evidence" standard with respect to the jury's finding on plaintiff's outrage claim, AFM made no other objection. Notably, AFM made no objection on the ground of lack of specificity and did not offer a more particularized instruction.

With respect to plaintiff's malicious prosecution claim against defendant American Family, if you find that plaintiff is entitled to recover actual damages then you will consider whether punitive damages should be allowed. Specifically, you must determine whether the plaintiff has demonstrated, by clear and convincing evidence, that the defendant American Family's conduct towards the plaintiff was willful, wanton, or done with malice.

To be "clear and convincing," evidence should be "clear" in the sense that it is certain, plain to the understanding, unambiguous and "convincing" in the sense that it is so reasonable and persuasive as to cause you to believe it.

An act performed with a designed purpose or intent on the part of a person to do wrong or to cause injury to another is a wilful act.

An act performed with a realization of the imminence of danger and a reckless disregard or complete indifference to the probable consequences of the act is a wanton act.

Malice is a state of mind characterized by an intent to do a harmful act without a reasonable justification or excuse.

If you determine punitive damages should be allowed with respect to plaintiff's malicious prosecution claim, your finding should be entered in the verdict form. After the trial, the court will conduct a separate hearing and will determine the amount of punitive damages to be allowed.

#### INSTRUCTION NO. 25

In no case may punitive damages be assessed against defendant American Family for the acts of any agent or employee, unless the questioned conduct was authorized or ratified by a person expressly empowered to do so on behalf of the defendant American Family.

Further, in conjunction with these instructions, the verdict form contained the following questions:

(8) If you awarded the plaintiff actual damages in Question (7), what amount of punitive damages, if any, do you find should be assessed against defendant American Family with respect to plaintiff's claim of outrage?

$_____ .

(11) If you awarded the plaintiff actual damages in Question (10), do you find, by clear and convincing evidence, that the plaintiff is entitled to punitive damages with respect to her malicious prosecution claim?

YES ____ NO ____

Reviewing the instructions as a whole, the court finds that they reasonably accommodated AFM's "interest in rational decisionmaking and [the state's] interest in meaningful individualized assessment of appropriate deterrence and retribution." *Id.* at 1044. With respect to the outrage claim, the jury was given significant, but not unlimited, discretion in the assessment of punitive damages. Importantly, the instructions informed the jury, in accordance with Kansas law, that the purpose of the award was punishment and deterrence. *See Tetuan v. A.H. Robbins Co.*, 241 Kan. 441, 481, 738 P.2d 1210, 1239 (1987) (discussing standards governing punitive damages in Kansas). Further, the jury was informed that they were not compelled to award punitive damages. With respect to the malicious prosecution claim, the jury was not allowed to determine what amount of punitive damages should be awarded. Rather, in accordance with applicable Kansas law, they were simply asked whether AFM's conduct had met certain standards and whether plaintiff was entitled to punitive damages. The actual award of punitive damages was then made by the court after a hearing and careful consideration of the specific factors set forth in K.S.A. 60–3701. For these reasons, the court finds that the instructions adequately protected AFM's due process rights. See *Mason*, 948 F.2d at 1559.

The court now turns to the actual punitive damage awards. In *Folks v. Kansas Power and Light Co.*, 243 Kan. 57, 755 P.2d 1319 (1988), the Kansas Supreme Court set forth the following standards for

**1028**

the review of a jury's award of punitive damages:

An award of punitive damages must be reviewed in the light of the actual damages sustained, the actual damage award, the circumstances of the case (the nature, extent, and enormity of the wrong), the intent of the party committing it, the relative positions of the plaintiff and the defendant, the defendant's financial worth and the plaintiff's probable litigation expenses. (Citation omitted.)

*Id.* at 78, 755 P.2d 1319.

 Considering the jury's punitive damage award for plaintiff's outrage claim in light of these factors, the court finds no reason for concluding that the award is excessive or was motivated by passion, prejudice or bias. The jury determined that plaintiff was entitled to $3,500,000.00 in actual damages with respect to her outrage claim. They then assessed $1,350,000.00 in punitive damages. Thus, the ratio of punitive damages to actual damages is less than 1 to 1. Further, as described throughout this opinion, AFM's course of misconduct was lengthy and severe. Moreover, AFM's misconduct occurred when plaintiff was in an extremely vulnerable position. That is, plaintiff was dependent upon AFM's assistance in restoring her to the standard of living she enjoyed prior to the fire. What she received from AFM could be described as anything but assistance. Further, plaintiff has spent significant amounts in pursuing this action. Finally, in light of AFM's enormous assets, it is questionable whether the amount award by the jury is significant enough to deter AFM and others from engaging in similar conduct in the future. *See Mason v. Texaco, Inc.*, 741 F.Supp. 1472, 1517 (D.Kan. 1990) (citing *Iola State Bank v. Bolan*, 235 Kan. 175, 193, 679 P.2d 720 (1984)). In conclusion, the court's conscience is in no way shocked by the award.

As for plaintiff's malicious prosecution claim, the court itself assessed punitive damages in accordance with K.S.A. 60–3701. In so doing, the court held a hearing to consider the specific factors set forth in subsection (b) of that statute and allowed the parties to file post-hearing briefs. The court then assessed $1,250,000.00 in punitive damages after careful consideration of the evidence presented at trial and the post-trial punitive damage hearing. Accordingly, the court finds no reason to conclude that AFM's due process rights are violated by this award.

**B. Motion for new trial**

AFM has asserted several grounds in support of its motion for new trial. The court will briefly review each of these grounds in the order in which they are presented in AFM's motion.

*1. Court's admission of plaintiff's exhibit # 830—videotape regarding the foam rubber cushion burn tests.*

 AFM contends that it is entitled to a new trial because of the admission of plaintiff's exhibit # 830, which was a demonstrative videotape prepared by Pat McGinley. Specifically, AFM contends that the rubber cushions used by McGinley in the videotape did not have any covering on them and were thus different from the cushions on the sofa that was located in plaintiff's basement at the time of the fire. Further, AFM argues that the tests were "not conducted under conditions substantially similar to actual conditions that are at issue in the trial of this lawsuit." For these reasons, AFM argues, the videotape was "misleading, confusing and highly prejudicial to defendant."

The court finds no merit to AFM's contention. At the time of trial, the court reviewed the videotape, out of the presence of the jury, prior to ruling on its admissibility. After viewing the tape, the court concluded that the tape would be helpful to the jury. Further, the court determined that the admission of the tape would be more probative than prejudicial. Upon review, the court affirms those conclusions and finds no basis for concluding that AFM's substantial rights were prejudiced by admission of the tape. AFM's argument is therefore rejected.

### 2. Court's admission of plaintiff's exhibit # 836—videotape regarding flashover.

AFM also objects to the admission of plaintiff's exhibit # 836, which was a demonstrative exhibit concerning the subject of flashover. Like exhibit # 830, the court viewed exhibit # 836 prior to ruling on its admissibility. After viewing the tape, the court concluded that it would be instructive and would be more probative than prejudicial. As with exhibit # 830, the court affirms these findings upon review and rejects AFM's request for a new trial.

### 3. Substantial evidence to support verdict.

Finally, AFM contends that it is entitled to a new trial "based on the confluence" of all of its previous arguments. For the reasons stated above, the court rejects AFM's motion. In so doing, the court specifically finds that the verdict, in its entirety, is based on substantial evidence.

### IV. Conclusion

For the reasons set forth above, AFM's motion for judgment notwithstanding the verdict is denied. Likewise, AFM's motion for a new trial is denied. AFM's motion for remittitur will be denied in part and granted in part.

IT IS THEREFORE ORDERED that defendant American Family Mutual Insurance Company's motion for judgment notwithstanding the verdict, or in the alternative, to alter or amend a judgment, or in the alternative, for remittitur, or in the alternative, for new trial (Doc. # 1008) is granted in part and denied in part.

IT IS FURTHER ORDERED that a remittitur in the amount of $65,638.57 is hereby granted, thus reducing the total judgment to $7,367,433.43, exclusive of the $250,000.00 attorneys' fee award.